Cheshire
No. 91-322

TOWN OF GILSUM

v.

MONADNOCK REGIONAL SCHOOL DISTRICT

July 23, 1992

34

*Bell, Falk & Norton P.A.*, of Keene (*Arnold R. Falk* on the brief and orally), for the Town of Gilsum.

*Goodnow, Arwe, Ayer and Prigge P.C.*, of Keene (*William N. Prigge* and *Joseph S. Hoppock* on the brief, and *Mr. Hoppock* orally), for Monadnock Regional School District.

*John P. Arnold*, attorney general (*Ann F. Larney*, assistant attorney general, on the brief and orally), for the State.

BATCHELDER, J. This is an appeal from the Superior Court's (*Hollman*, J.) order on Monadnock Regional School District's (Monadnock Regional) motion for summary judgment on the question of the financial liability for the regular education expenses of students placed at Country Acres Group Home (Country Acres) pursuant to court order. The superior court held the division for children and youth services (DCYS) liable for these expenses with a right of action for such expenses against the parents or others legally chargeable for the children's support. For the reasons set forth below, we reverse.

The facts pertinent on appeal are as follows. Country Acres, located in the Town of Gilsum, is a residential facility, housing up to fourteen dependent, neglected and/or abused female children. Children are placed at Country Acres by the district courts pursuant to RSA chapters 169-B, -C, and -D, and they attend public school in Monadnock Regional. Gilsum, as a member of Monadnock Regional, pays a proportional share of the capital expenses and operational costs of the school district. *See* RSA 195:7. Monadnock Regional's operational costs are apportioned to the towns based on the average daily membership (ADM) of students from the town. Children placed at Country Acres attend schools in Monadnock Regional and have been included in Monadnock Regional's ADM assessment to Gilsum.

In July 1990, Gilsum, contending it had been improperly billed by Monadnock Regional for the educational costs of Country Acres children, filed a petition for declaratory judgment against Monadnock Regional. Subsequently, the superior court granted Gilsum's motion for summary judgment against Monadnock Regional, holding that Monadnock Regional could not lawfully include Country Acres students in its calculation of the ADM assessment to Gilsum. After granting Monadnock Regional's motion to join DCYS, the superior court granted Monadnock Regional's motion for summary judgment against DCYS, holding that DCYS is initially liable for the regular educational expenses of children placed at Country Acres. DCYS appeals this ruling. Monadnock Regional cross-appeals against Gilsum on the issue of the inclusion of Country Acres students in Gilsum's ADM.

DCYS argues that it is not liable for the costs of regular public education associated with the court-ordered child placements according to the plain meaning of RSA 169-B:40, -C:23 and -D:29. It contends that the statutes designed to address financial liability for placement education, RSA 193:27–29, operate to shift these costs

from the school district in which the group home is located (the "receiving district," RSA 193:27, V) to the district in which the child resided prior to the placement (the "sending district," RSA 193:27, IV). Gilsum joins Monadnock Regional's argument that DCYS is liable for the expenses and, in the alternative, joins DCYS's argument that RSA 193:29 applies.

■■ This case requires us to examine the interrelationship of several statutes pertaining to education and the court-ordered placement of juveniles. Our analysis must start with consideration of the plain meaning of the statutes, *Gilmore v. Bradgate Assoc., Inc.*, 135 N.H. 234, 237, 604 A.2d 555, 556 (1992), construing them to effectuate their underlying policies, *Swiezynski v. Civiello*, 126 N.H. 142, 146, 489 A.2d 634, 637 (1985). Additionally, insofar as possible, we will construe the various statutory provisions harmoniously. *Id.* at 148, 489 A.2d at 639.

■■ The statutes dealing with children who are delinquent, abused or neglected, or in need of services, RSA chapters 169-B, -C, and -D, seek to provide treatment, care, protection, counselling, and rehabilitation resources to the children coming within their respective provisions. RSA 169-B:1, I; 169-C:2; 169-D:1, V (Supp. 1991). Dispositional orders issued by the district courts relative to such children may provide for appropriate services and placements. *See, e.g.*, RSA 169-D:17. RSA 169-B:40, I(a) and its verbatim counterparts at RSA 169-C:27, I(a) and RSA 169-D:29, I(a) (the liability sections) address the liability for the expenses for these services:

> "Whenever an order creating liability for expenses is issued by the court under this chapter, any expenses incurred for services, placements and programs the providers of which are certified pursuant to RSA 170-G:4, XVIII, shall be payable by the division for children and youth services, department of health and human services."

Monadnock Regional argues that under the plain meaning of the liability sections, the school district provides the "service" of education to Country Acres students and is thus entitled to payment by DCYS. It points out that the statutes at RSA 169-B:40, I(b) (Supp. 1991), -C:27, I(b) (Supp. 1991), and -D:29, I(b) (Supp. 1991) specifically exempt DCYS from liability for expenses for special education and related services, claiming these exemptions show a legislative intent to include expenses for regular public education within DCYS's responsibility.

The flaw in Monadnock Regional's argument is found upon examination of RSA 170-G:4, XVIII, the statute referred to within the liability sections. DCYS is liable, pursuant to those sections, for "any expenses incurred for services, placements and programs *the providers of which are certified pursuant to RSA 170-G:4, XVIII . . . ."* *E.g.,* RSA 169-B:40, I(a) (emphasis added). For Monadnock Regional to prevail, regular public education must be a service, placement or program the provider of which is so certified.

RSA chapter 170-G established the division for children and youth services. The powers and duties of DCYS are set forth in RSA 170-G:4. One of these is to certify providers to which DCYS is financially liable pursuant to RSA chapters 169-B, -C, and -D court orders. RSA 170-G:4, XVIII states that DCYS shall:

> "Certify all providers of services, placements and programs which are paid for by the division pursuant to RSA 169-B:40, 169-C:27, 169-D:29, and any services required to be provided by the division pursuant to paragraph II of this section. Each certification issued for this purpose shall have 2 components: one based upon standards of quality and performance, and one based upon the need the state may have for such service, placement or program. When educational aspects are present in any service, placement or program subject to certification by the division, certification for the educational component shall be addressed jointly by the division and the department of education. The commissioner of the department of health and human services shall develop by rule an appeal process for providers of services, placements, and programs who have sought and been refused certification under this paragraph."

■ Although the terms "services," "placements" and "programs" are not defined, we believe it strains the language to interpret them to include regular public education provided by a local school district. First, the legislature's expressed purpose in passing the certification provision does not appear to contemplate regular public education:

> "I. The legislature recognizes the need for the state to certify all providers of services, placements and programs for children who are delinquent, abused or neglected, or in need of services. The aims of such certification should be to avoid unnecessary duplication of efforts, to prevent unreasonable

cost increases, and to allow for efficient use of available resources.

"II. To achieve these aims, the state must have clear standards and procedures to assure quality and to assess need for these services, placements, and programs."

Laws 1987, 402:27 (reprinted at RSA 170-G:4). Regular public school education is not a "service[ ], placement[ ] [or] program[ ] for children who are delinquent, abused or neglected, or in need of services." It is the right of all children in the State. *See* RSA 189:1-a. In addition, it cannot seriously be argued that the State must "assess need for" public education. Country Acres, on the other hand, is an intermediate group home facility, licensed to provide room and board, care, and treatment for children ordered placed there by the court. Certified by the State pursuant to RSA 170-G:4, XVIII, it is the type of service, placement or program contemplated by the statute.

█ Furthermore, Monadnock Regional's argument that it provides a "service" within the liability sections is incompatible with the following language of RSA 170-G:4, XVIII: "When *educational aspects* are present in any service, placement or program subject to certification by the division, certification for the *educational component* shall be addressed jointly . . . ." (Emphasis added.) "Educational aspects," however, are not "present" in the service provided by Monadnock Regional; they *are* the service. Further, to speak of an "educational component" of the public schools makes no sense. As the legislature will not be deemed to have intended the illogical, *Appeal of Coastal Materials*, 130 N.H. 98, 105, 534 A.2d 398, 402 (1987), we conclude it did not intend for regular public education to be considered a service, placement or program within the meaning of RSA 170-G:4, XVIII, but rather intended this language to cover residential juvenile placements with on-site education facilities.

Monadnock Regional also seeks to define itself within the statute by characterizing itself as an "educational aspect" of the girls' placements at Country Acres. As noted above, however, Country Acres is a group home facility without on-site education. There is no evidence that girls are ordered placed there by the district courts pursuant to RSA chapters 169-B, -C, or -D so that they may receive an education at Monadnock Regional. Rather, they are placed at Country Acres presumably for the care and treatment offered by the group home itself. Attending public school in Monadnock Regional is thus not an educational aspect of the placement but merely incidental to it.

The cases relied upon by the superior court below and by Monadnock Regional here are therefore inapposite. In both *In re Todd P.*, 127 N.H. 792, 509 A.2d 140 (1986), and *In re Laurie B.*, 125 N.H. 784, 489 A.2d 567 (1984), we held that the statutorily liable unit (then, the town; now, DCYS) was liable not only for the cost of the residential placement but also "the cost of placement education." *In re Laurie B.*, 125 N.H. at 789, 489 A.2d at 570; *see In re Todd P.*, 127 N.H. at 797, 509 A.2d at 143. In both cases, however, the children received their education at the child care facility at which they were placed. Neither decision involved financial liability for the cost of regular public education in the school district in which the placement facility was located. They do not support holding DCYS liable in this case.

■ We conclude that there is no statutory authority for holding DCYS liable for the costs of regular public education incidental to the placement of children at Country Acres. The superior court erred in holding otherwise.

In the alternative, DCYS and Gilsum contend that the provisions of RSA 193:27 to :29 operate to shift the education costs at issue from the school district where the child resides in placement (the "receiving district," RSA 193:27, V) to the school district where the child resided prior to placement (the "sending district," RSA 193:27, IV). Monadnock Regional, on the other hand, argues that the cost-shifting provisions of RSA 193:27 to :29 were not intended to apply to the regular public education expenses at issue here.

RSA 193:29, I(a) and I(c) are concerned with the costs of special education for institutionalized children. *See also* RSA 186-C:13 (Supp. 1991) (liability for expenses for educationally disabled child "determined in accordance with RSA 193:29"). The legislative purposes behind these statutes were "first, to alleviate the unfair financial burden which previous laws had placed on school districts in which there were group homes or other child care facilities, and second, to ensure that the education of handicapped children 'will not be interrupted by disputes between school districts over their financial liability.'" *In re Gary B.*, 124 N.H. 28, 32, 466 A.2d 929, 931 (1983) (quoting 1981 Senate Education Committee Minutes, HB 604 at 1 (May 12, 1981) (prepared remarks of Rep. Taffe)). To those ends, RSA 193:29, I, provides that "the sending district shall make payments to the receiving district."

■ Only subparagraph (b) of RSA 193:29, I, does not explicitly address special education costs, and it is this section on which

Gilsum and DCYS seek to predicate the sending districts' liability for the cost of Country Acres students' regular public education at Monadnock Regional. RSA 193:29, I(b) provides:

> "For a child attending a public school to which the receiving district as defined in RSA 193:27 shall pay tuition under an AREA or other contractual agreement, the sending district as defined in RSA 193:27 is liable for all costs which said receiving district must pay under that agreement."

As Gilsum and DCYS read this provision, Gilsum pays "tuition" to Monadnock Regional under a "contractual agreement" and is therefore entitled to reimbursement from the various sending districts representing the former homes of the Country Acres residents. Such broad definitions of these terms, however, are inconsistent with their specific meanings in related statutes and with the statutory scheme as a whole with respect to education.

An AREA agreement, as referred to in RSA 193:29, I(b), is addressed in RSA chapter 195-A. Such an agreement results in the creation of an AREA school, defined as "an authorized regional enrollment area school" that is "the assigned school for all the resident elementary or secondary pupils of the school districts or portions thereof within the region which it is established to serve." RSA 195-A:1, IV. Tuition is paid to the school district in which the AREA school is located (the "receiving district," RSA 195-A:1, VI) by the district that sends its pupils there (the "sending district," RSA 195-A:1, V). RSA 195-A:1, IX. AREA school agreements thus contemplate agreements between school districts, providing education in one school district to children who live in another, with a corresponding payment of tuition.

The phrase "other contractual agreement" in RSA 193:29, I(b) must be construed to embrace agreements like in character to AREA agreements. *See Hackett v. Gale*, 104 N.H. 90, 92, 179 A.2d 451, 453 (1962) (general words following specific words in statute construed to include only objects similar in nature to objects specifically enumerated). So understood, the agreements referred to must be similar in nature to an agreement between a school district that provides education and one that pays tuition therefor.

Monadnock Regional is not a party to a contractual agreement with Gilsum as that phrase is used in RSA 193:29, I(b). As a member of a cooperative school district pursuant to RSA chapter 195, the pre-existing school district of Gilsum ceased to exist when

Monadnock Regional came into existence. *See* RSA 195:6, I ("pre-existing district[ ] shall be deemed dissolved" when cooperative school district assumes its functions). Gilsum does not pay "tuition" to Monadnock Regional, but rather pays its share of capital outlay and operational costs according to a formula described in RSA chapter 195. *Compare* RSA 194:27 ("Tuition") *and* RSA 195-A:1, IX ("Tuition") *with* RSA 195:7 ("Costs of Capital Outlay and Operation"). Because we interpret the statutes concerning education consistently with each other, *see Petition of Public Service Co.*, 130 N.H. 265, 282, 539 A.2d 263, 273 (1988), *appeal dismissed*, 488 U.S. 1035 (1989), we cannot read "other contractual agreement" in RSA 193:29, I(b) to encompass the relationship between Gilsum and Monadnock Regional.

■ Furthermore, the legislative history of RSA 193:27 to :29 indicates that the provisions were designed to relieve the receiving district in which a group home is located of the burden of "extraordinary educational costs." 1981 House Education Committee Minutes, HB 604 at 2 (April 14, 1981) (prepared remarks of Rep. Taffe). The targeted extraordinary costs were "the cost of special education and out-of-district tuition costs." *Id.* at 1. The intent of the legislation was to "reliev[e] the hostile feelings toward opening of group homes in towns that heretofore had to assume *all* of the educational costs for the youngsters in these homes," but it "would not affect [a] child receiving a normal education in the receiving district [as] this is not where the real extraordinary costs are." *Id.* at 2 (emphasis added). We therefore conclude that RSA 193:29 is not applicable to the expenses at issue here.

Finally, we address Monadnock Regional's cross-appeal against Gilsum. According to Monadnock Regional, if neither DCYS nor the sending districts are liable for the regular educational expenses at issue, the liability falls on Gilsum and the superior court erred in granting Gilsum's motion for summary judgment against Monadnock Regional. Gilsum argues that Monadnock Regional lacks authority for the inclusion of students residing at Country Acres in its assessment to Gilsum for Gilsum's share as a member of the cooperative school district.

■ Children living in a group home generally have the right to attend public school in the school district in which they live. RSA 193:28. School districts have the duty "to provide, at district expense, elementary and secondary education to all pupils who reside

42

in the district . . . ." RSA 189:1-a. For the duration of a child's placement at Country Acres, she resides in Monadnock Regional. *See In re Gary B.*, 124 N.H. at 32, 466 A.2d at 932. Monadnock Regional, therefore, is liable for providing an education to the girls living at Country Acres.

■ As a member of Monadnock Regional, Gilsum is assessed its share of district operational costs pursuant to a formula established by the cooperative school district. *See* RSA 195:7. According to this formula, the district's operational costs are apportioned to the towns based on the average daily membership of students in the town as they relate to the total district's ADM. *See Monadnock School District v. Fitzwilliam*, 105 N.H. 487, 495, 203 A.2d 46, 52 (1964) (average daily membership is "average daily number of [the town's] students attending the school"). Residents at Country Acres are thus properly counted in the Gilsum assessment, and the superior court erred in holding to the contrary.

We are not unmindful of the burden that allocation of this cost to the resident town creates. A small town with one or more placement institutions may be severely impacted by the public education costs. This case is decided under a legislative matrix that requires such allocation. The legislature may lift this burden by appropriate legislation allocating the burden to DCYS or, to the extent permitted by our State Constitution, to the domicile district.

*Reversed.*

All concurred.