Manchester District Court
No. 2004-789

IN RE JUVENILE 2004-789-A *& a.*

Argued: September 14, 2005
Opinion Issued: April 7, 2006

*Upton & Hatfield, LLP*, of Hillsborough (*Margaret-Ann Moran* and *Kelly E. Dowd* on the brief, and *Ms. Moran* orally), for the appellant, Unity School District.

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Dean B. Eggert* on the brief and orally), for the appellee, Manchester School District.

BRODERICK, C.J. The Unity School District (Unity SD) appeals from orders of the Manchester District Court (*Emery*, J.) denying its motions to dismiss and to reconsider. At issue is whether the Unity SD or the Manchester School District (Manchester SD) is required to reimburse the Nashua School District for the special education expenses for a juvenile, pursuant to RSA 193:29 (1999). Unity SD argues that the court erred in its interpretation and application of RSA 193:27 (1999). We reverse and remand.

The record supports the following. On October 27, 2003, petitions for abuse and neglect were filed, alleging that Juvenile 2004-789-A (Juvenile A) and his older brother Juvenile 2004-789-B (Juvenile B) had been neglected by their mother. *See* RSA 169-C:3, XIX(b) (2002). Prior to the filing of the petitions, both juveniles lived in Manchester with their mother. Apparently, the children's father was, and continues to be, hospitalized in an out-of-State veterans affairs medical facility; he is not a party to this appeal. Juvenile B is learning disabled, and receives special education. As there is no dispute between the parties concerning Juvenile A, we limit the balance of our discussion and analysis to the circumstances of Juvenile B.

On or about October 27, the mother left Juvenile B in the care of a neighborhood friend in Manchester, as she was scheduled to enter a nursing home due to health issues. Because a nursing home bed was not available in Manchester, the mother was admitted to the Sullivan County Nursing Home on or about October 28, 2003. There is no dispute that the Sullivan County Nursing Home is located within the geographic boundaries of the Unity SD. The mother remained there until April 2005, when she was admitted to the Laurel Center in Bedford.

On October 31, after a preliminary hearing, the trial court awarded "legal supervision" of Juvenile B to the division for children, youth and families (DCYF). The court also ordered that Juvenile B continue to live with the mother's friend while DCYF conducted an investigation into the "appropriateness" of his remaining there. On November 4, following a hearing, the District Court (*Ryan*, J.) found "reasonable cause to believe" that Juvenile B was neglected, and awarded legal custody of him to DCYF, with orders to place him in a licensed and certified out-of-home placement.

On November 10, DCYF actually placed Juvenile B in the Nashua Children's Home. Prior to his placement there, Juvenile B had lived and attended school in Manchester; he has never lived or attended school in the town of Unity.

As a result of subsequent proceedings, the District Court (*Emery*, J.) determined that Unity SD was the "sending district" with respect to Juvenile B. *See* RSA 193:27, IV. Unity SD objected to being so designated

and moved to be dismissed from the proceedings. It contended that Manchester SD should be the "sending district," pursuant to RSA 193:27, IV, for the purpose of reimbursing the Nashua School District for the special education expenses related to Juvenile B under RSA 193:29, I(a). Following hearings in April and August 2004, the trial court denied Unity SD's motion to dismiss, as well as its motion to reconsider. This appeal followed.

Unity SD argues that the trial court erred as a matter of law in its interpretation and application of RSA 193:27. Specifically, it contends that the court erred in: (1) failing to apply the correct definition of "sending district"; and (2) determining the residency of Juvenile B's mother. In considering a motion to dismiss, our standard of review is

> whether the allegations in the plaintiff's pleadings are reasonably susceptible of a construction that would permit recovery. We assume the plaintiff's pleadings to be true and construe all reasonable inferences drawn therefrom most favorably to [it]. We need not assume the truth of statements in the plaintiff's complaint, however, which are merely conclusions of law.

*Karch v. Baybank FSB*, 147 N.H. 525, 529 (2002) (citations, quotations and brackets omitted). In denying Unity SD's motion to dismiss, the trial court construed RSA 193:27 and applied it to an essentially undisputed set of facts. As such, this appeal presents a question of law, which we review *de novo. See State v. Simone*, 151 N.H. 328, 330 (2004).

We first turn to Unity SD's argument that the trial court failed to apply the correct definition of "sending district." Both parties agree that RSA 193:27, IV defines a sending school district and governs this case. Our analysis must start with consideration of the plain meaning of this and other relevant statutes, construing them, where reasonably possible, to effectuate their underlying policies. *See Nashua School Dist. v. State*, 140 N.H. 457, 458 (1995). Insofar as reasonably possible, we will construe the various statutory provisions harmoniously. *Id.*

At the outset, we note that this case requires us to again examine the interrelationship of several statutes pertaining to education and the court-ordered placement of juveniles. *See Town of Gilsum v. Monadnock Reg. School District*, 136 N.H. 32, 36 (1992). Because RSA 193:27 is not a model of clarity, it is understandable why the definition of "sending district" has been confusing for school districts. *See Manchester School District v. Crisman*, No. Civ. 97-632-M, 2001 WL 311202, at *2 (D. N.H. March 26, 2001) (New Hampshire's statutes defining rights and obligations related to public education are "statutory thicket," requiring "more than a fair degree of stamina to navigate"). Our holding today confirms a bright-line

rule for its application, one that we believe is justified based upon the language of the statute and associated statutes, administrative rules, and our previous case law. It is for the legislature to determine whether the statute, as interpreted here, should be amended, as we will not put words into the statute where the legislature has chosen not to do so. *See Grenier v. Barclay Square Commercial Condo. Owners' Assoc.*, 150 N.H. 111, 118 (2003); *In re Estate of Locke*, 148 N.H. 754, 759 (2002).

RSA 193:27, IV defines "sending district" and reads, in pertinent part:

> "Sending district" means the school district in which a child most recently resided . . . if such child is not in the legal custody of a parent or if the parent resides outside the state; if the child is retained in the legal custody of a parent residing within the state, "sending district" means the school district in which the parent resides. . . . When custody is transferred subsequent to the original placement of a child in a home for children, . . . the "sending district" shall be, from the change in legal custody or guardianship forward, that district in which the child resided at the time of the original placement.

RSA 193:29, I, details a sending school district's liability for the educational expenses for a child placed in a home for children and reads, in pertinent part:

> For any child placed and cared for in any home for children or health care facility, the sending district shall make payments to the receiving district . . . .

As noted by both parties and the trial court, RSA 193:27, IV contains two distinct definitions for a sending school district. The first definition applies in those instances where the child is not in the legal custody of a parent, or the parent resides outside the State. The second definition applies in those instances where the child is retained in the legal custody of a parent residing within the State. Both parties agree that the question of which definition is applicable to the facts of a case depends upon the time at which the trial court must apply RSA 193:27 to determine the sending district. The parties also agree that RSA 193:27 is silent as to when the sending district determination must be made. In denying Unity SD's motion to dismiss, the trial court examined the time period from October 27, 2003, to the "placement" of Juvenile B at the Nashua Children's Home, concluded that he "was in the mother's legal custody prior to placement," and applied the second definition—that the sending district was the school district in which the mother resided.

Unity SD contends that the relevant time standard is the date on which the trial court actually makes the funding liability determination—here, October 1, 2004 (the date the court denied the motion to dismiss, thereby confirming Unity SD as the sending district). As such, Unity SD argues that the first definition of "sending district" is applicable because legal custody for Juvenile B was awarded to DCYF on November 4, 2003, and the child was not in the legal custody of his mother when the trial court denied its motion to dismiss on October 1, 2004.

Manchester SD contends that the relevant time standard is that "point in time immediately prior to the change in custody"—here, November 4, 2003 (the date the court awarded custody to DCYF). As such, Manchester SD argues that the second definition of "sending district" is applicable. It further contends that the trial court's ruling was correct because Juvenile B remained in his mother's custody until November 4, 2003, and the mother resided in Unity "when custody was transferred to DCYF and prior to [his] placement at the Nashua Children's Home."

█ We disagree with both parties' arguments, and with the trial court's determination. Instead, we find that the relevant time standard for defining the terms in RSA 193:27 is provided in the plain language of RSA 193:29, I. Specifically, the determination of the sending district should be based upon when the child is actually "placed and cared for in any home for children or health care facility."

We agree with both parties that a "bright-line" rule is necessary for the consistent application of the statutes. Such a rule, however, and the consequent time standard for construing RSA 193:27 already exist in the plain language of RSA 193:29. Clearly, until a child is actually placed and cared for in a home for children, there is no sending district, no receiving district, and, consequently, no financial liability for that child. Accordingly, we do not believe it necessary to literally engraft a time standard onto RSA 193:27 when the legislature did not see the need to do so. "In construing a statute, we will neither consider what the legislature might have said nor add words that it did not see fit to include." *Monahan-Fortin Properties v. Town of Hudson*, 148 N.H. 769, 771 (2002).

The plain language of both RSA 193:29, IV and RSA 193:27, IV further supports our view that the date of the original actual placement of a child in a children's home is the intended time standard for determining the sending district as defined in RSA 193:27. Specifically, RSA 193:29, IV states:

> The agency responsible for placing the child shall inform the sending and receiving districts of where the child presently resides and where the child last resided *before placement in a*

*home for children*, health care facility, or state institution or where the parent of the child resides if the child is in the legal custody of a parent who resides within the state.

(Emphasis added.) RSA 193:27, IV states:

When custody is transferred subsequent to the *original placement of a child in a home for children*, ... the "sending district" shall be, from the change in legal custody or guardianship forward, that district in which the child resided *at the time of the original placement*.

(Emphasis added.)

Other associated statutes, as well as earlier cases, have implicitly recognized the same. *See* RSA 186-C:13, I(a) (1999) (*"When* an educationally disabled child *is placed in a home for children* or health care facility as defined in RSA 193:27, *the liability for expenses for such child shall be determined* in accordance with RSA 193:29.") (emphasis added)); *Nashua School Dist.*, 140 N.H. at 459 (same); *Manchester School Dist. v. Crisman*, 306 F.3d 1, 11-14 (1st Cir. 2002) (same).

Further, our plain meaning analysis of RSA 193:29 and its application to RSA 193:27 also effectuate the statutes' underlying policies. RSA 193:29, I(a) and RSA 186-C:13, I(a) are concerned with the costs of special education for institutionalized children. *See Town of Gilsum*, 136 N.H. at 39. The legislative purposes behind these statutes and RSA 193:27 were

first, to alleviate the unfair financial burden which previous laws had placed on school districts in which there were group homes or other child care facilities, and second, to ensure that the education of handicapped children will not be interrupted by disputes between school districts over their financial liability.

*Id.* (quotations omitted); *see In re Gary B.*, 124 N.H. 28, 32 (1983). Here, our application of a time standard already extant in the statutory scheme reduces the risk of inconsistent or arbitrary results that we believe might follow from either party's interpretation of RSA 193:27. Instead, construing the statutory provisions harmoniously as we have provides a bright-line rule. Such rules, in the words of the Manchester SD, "avoid[] the requirement of judicial resolution in every case ... [and] inconsistent [or arbitrary] results in cases that are adjudicated."

Although our plain meaning analysis provides ample foundation for our interpretation of the statutes, we note that the State Code of Administrative Rules gives further support that the word "placed" in RSA 193:29 provides the temporal context for the definitions in RSA 193:27, and

refers to that time when the child is actually placed in the children's home. Specifically:

> "Place" means the *act of enrolling a child in a placement.*

> ... "Placement" means the *enrollment of a child in,* or committing or moving a child to, *an educational program or residential program or facility* ....

N.H. ADMIN. RULES, Ed 1130.02(a)(12), (13) (emphasis added); *see Manchester School Dist.,* 306 F.3d at 9 ("New Hampshire ... gives some deference to the reasonable interpretation of a state statute by the state administrative agency charged with the responsibility of enforcing that statute."); *cf. Appeal of N.H. Dep't of Transportation,* 152 N.H. 565, 573 (2005) (when meaning of statute in doubt, court defers to long-standing practical interpretation given statute by administrative entity without legislative interference).

Unity SD's proposed interpretation, to define "sending district" based upon when the trial court actually makes a funding liability determination, would render such definition unnecessarily fluid. An individual court or judge's scheduling limitations, the possibility of multiple hearings, or the potential for reconsideration of an initial adjudication, might delay a liability determination until a date significantly after the initial placement. In this case, Unity SD moved to reconsider the trial court's funding liability determination of October 1, 2004. That motion was denied on October 21, over eleven months after Juvenile B's initial placement in the Nashua Children's Home. Although Juvenile B remained in the custody of DCYF throughout that time period, the temporal fluidity of Unity SD's proposed interpretation may mean that a child could be the subject of one or more custody transfers, without a corresponding transfer of school district financial liability, before a funding liability determination is made. Such circumstances would render superfluous the language of RSA 193:27, IV regarding funding liability when "custody is transferred subsequent to the original placement of a child in a home for children." *See Binda v. Royal Ins. Co.,* 144 N.H. 613, 616 (2000) (legislature is presumed not to have used superfluous words).

Manchester SD's proposed interpretation, to define "sending district" based upon "that point in time immediately prior to the change in custody" (here, to DCYF), is equally susceptible to such fluidity. In addition, Manchester SD's interpretation would sometimes result in a determination of financial liability for a sending school district before such liability was incurred. Here, Juvenile B was in the legal custody of his mother from October 27 to November 4, 2003. After November 4, however,

Juvenile B was, and remains, in the legal custody of DCYF. Manchester SD's interpretation (looking to the change in custody date) would result in the Unity SD being financially liable for Juvenile B's special education expenses incurred from November 4 until his placement in the Nashua Children's Home on November 10. During that time, however, Juvenile B was actually enrolled in the McLaughlin Middle School in Manchester. We decline to interpret RSA 193:27, IV to render the Unity SD liable for Juvenile B's special education expenses while he was attending school in the Manchester SD. *See Monahan-Fortin Properties*, 148 N.H. at 771 ("We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result."). In addition, we disagree that the trial court must look to that point in time immediately prior to the change in custody when applying the definition of RSA 193:27, IV. Assuming that, in most cases, children will be in parental custody immediately prior to an initial custody change, we further decline to interpret RSA 193:27, IV such that its first definition could be applicable only in those very few cases where the parent resides outside the State.

■ Applying our interpretation of the statutes to the facts of this case, we conclude that the Manchester SD is the sending school district for Juvenile B. On November 4, 2003, Juvenile B was in the legal custody of DCYF. Consequently, he was not in the legal custody of his parents on November 10, 2003, the date he was actually placed in the Nashua Children's Home. Accordingly, the "sending district" is the school district in which Juvenile B most recently resided. We have already held that "resided" in this context "refers to the place where a child actually lived, rather than to legal residence or domicile." *Gary B.*, 124 N.H. at 32 (citation omitted). Prior to the filing of the petition for abuse and neglect, and until his actual placement at the Nashua Children's Home, Juvenile B was living in Manchester with his mother or with her neighborhood friend. Pursuant to the plain language of RSA 193:27 and RSA 193:29, Manchester SD is the sending district.

Because our holding, above, is dispositive, we need not turn to Unity SD's second argument regarding the determination of the residency of Juvenile B's mother. We reverse the trial court's denial of Unity SD's motion to dismiss, and remand for further proceedings in accordance with this opinion.

*Reversed and remanded.*

DALIANIS, DUGGAN and GALWAY, JJ., concurred.