Plymouth Family Division
No. 2006-870

IN THE MATTER OF GEORGE J. NASSAR AND MAUREEN NASSAR

Submitted: November 13, 2007
Opinion Issued: March 7, 2008

*Harvey & Mahoney, P.A.,* of Manchester (*J. Campbell Harvey* on the brief), for the petitioner.

*McLaughlin Law Office, P.C.,* of Laconia (*Philip T. McLaughlin* on the brief), for the respondent.

DUGGAN, J. The petitioner, George J. Nassar (husband), appeals the Plymouth Family Division's (*Carbon,* J.) award of permanent monthly alimony to the respondent, Maureen Nassar (wife), in the amount of $1,100. We vacate and remand.

*I. Facts*

The record supports the following facts. The husband and wife are fifty-six and fifty-three years old, respectively. They were married on April 16, 1983, after residing together for approximately ten years. They have two children, both of whom are now emancipated adults.

Throughout the duration of the marriage, the husband's parents permitted the couple and their children to live rent free in a house they own on Squam Lake. Apart from this singular luxury, the parties lived a modest life. The couple could never afford to buy new furniture, and they consistently drove old cars that did not have heat. Indeed, the wife testified that one of her complaints had always been that the couple "did not have money."

Both parties worked to provide for their family. In addition to acting as the primary caretaker for the couple's children, the wife worked as a part-time substitute teacher early on in the marriage. For the last twenty years, she has worked as a waitress and a staff trainer at a restaurant. In that capacity, she is currently working twenty-four hours per week.

The husband held a variety of positions. For an unspecified period of time, he was a traveling salesman. From the late 1980s through the 1990s, he was the manager of a deli department at a grocery store. For the past several years, he has operated his parents' Squam Lake boat tour from May until October, and a ski check booth at Loon Mountain from approximately the middle of December until early April. The remainder of the year, he collects unemployment benefits. During the summer months, the husband works roughly seventy-five hours per week.

At some point between 1995 and 2000, the husband began to suspect that the parties' marriage would fail, but he did not verbalize his concerns to his wife. It was not until March 15, 2005, that he informed his wife that he was unhappy and wanted a divorce. Nevertheless, the record indicates that the relationship between the parties had been strained for some time. For example, the parties had been taking separate vacations for several years and had been filing individual tax returns since 2001. Moreover, they

had not been intimate for quite some time and, since 2004, the husband had slept on a couch in a separate room. Finally, although the wife requested several times that the parties seek counseling, the husband consistently rebuffed her suggestion.

At some point in 2000, the husband pushed the wife, causing her to fall over a chair. Following this incident, the wife moved out and the parties were estranged for three weeks. She ultimately decided to return because, as she testified, "[her] children were still young," "[t]hey didn't know why their mother left," and the husband "explained to [the children] that he had done something wrong" and promised to never do so again. There were no other incidences of physical abuse.

After the parties filed for divorce, the wife was awarded temporary alimony of $800 per month. She also received temporary use and possession of the home the couple had occupied during the marriage. However, because they still had legal title to the property, the husband's parents subsequently commenced an eviction proceeding against the wife. As a result, she was forced to vacate the premises. After she left, the husband immediately moved back in and, for the first time, executed a formal rental agreement with his parents.

At the final divorce hearing, the parties submitted a partial stipulation resolving the grounds for divorce, health insurance, retirement, debt and division of property. The principal issue remaining for the court was alimony. The wife asked for $1,500 a month and the husband objected to paying any amount.

In its final order, the court awarded the wife "permanent alimony" of $1,100 per month, "subject to an annual cost of living increase based upon the Consumer Price Index published by the Wall Street Journal." In support of its ruling, the court acknowledged "that the lifestyle during the marriage was modest." However, it held that "each party's employment prospects could be enhanced."

More particularly, the court found that, while the husband "is clearly working many hours per week for his parents, . . . his actualized hourly rate is diminimus [sic]." The court determined that the husband could increase his reported income of $41,000 by "choos[ing] to work another job where his hourly rate would be substantially higher." The court believed such an opportunity was available to the husband because "[h]is previous history with the deli business supports a finding that he has been successful in other ventures."

Moreover, the court ruled that the rental agreement between the husband and his parents was "specious." As a result, it held that the husband's "effective income is higher than he reports, given that he receives the benefit of housing from his parents." The court concluded that

the husband therefore had the ability to pay alimony because "the $900 which [the husband] claims he is paying as rent c[an] be applied towards alimony for [the wife]."

In addition, the court found that the wife "clearly has an ability to work more hours each week to become more self sufficient," despite her protestations that her current hourly schedule is "customary in the industry." It also held that the wife "had a reasonable expectation that support from [the husband's] parents would continue" and, thus, "there was less of a need [for her] to plan for future expenses than what might otherwise be the case." The court determined that the wife was accordingly in need of alimony. Finally, the court held that "the underlying circumstances giving rise to the divorce" supported an award of alimony.

## II. Analysis

On appeal, the husband argues that we must reverse the alimony award because: (1) the court considered the husband's fault in the dissolution of the marriage; (2) the award was made subject to an automatic, annual cost-of-living increase; (3) the record does not support the court's decision to award alimony for life; (4) the court considered the free housing provided by the husband's parents in ascertaining the wife's needs and the husband's ability to pay alimony; and (5) the court was motivated by "animus."

In reviewing the husband's claims, we will "sustain the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law." *In the Matter of Fowler & Fowler*, 145 N.H. 516, 519 (2000). "The trial court has broad discretion in determining and ordering ... the payment of alimony ...." *Id.* Accordingly, absent an unsustainable exercise of discretion, we will not overturn its factual findings. *In the Matter of Peirano & Larsen*, 155 N.H. 738, 746 (2007). However, we review its interpretation of the law *de novo. See In re Juvenile 2004-789*, 153 N.H. 332, 334 (2006).

A trial court is permitted to award alimony if it finds that:

> (a) [t]he party in need lacks sufficient income, property, or both ... to provide for such party's reasonable needs, taking into account the style of living to which the parties have become accustomed during the marriage; and (b) [t]he party from whom alimony is sought is able to meet reasonable needs while meeting those of the party seeking alimony, taking into account the style of living to which the parties have become accustomed during the marriage; and (c) [t]he party in need is unable to be self-

supporting through appropriate employment at a standard of living that meets reasonable needs . . . .

RSA 458:19, I (Supp. 2007). In determining the amount of alimony, the court may consider the value of economic and non-economic contributions to the family unit, RSA 458:19, IV(d), and:

shall consider the length of the marriage; the age, health, social or economic status, occupation, amount and sources of income, the property awarded. . ., vocational skills, employability, estate, liabilities, and needs of each of the parties; the opportunity of each for future acquisition of capital assets and income; the fault of either party as defined in RSA 458:16-a, II(l); and the federal tax consequences of the order.

RSA 458:19, IV(a). We turn now to the husband's specific arguments.

*A. Consideration of Fault*

The husband argues first that the court mischaracterized the parties' reconciliation following the incident of abuse and impermissibly considered fault in determining that the wife is entitled to alimony. More particularly, he argues that there is no basis in the record for the court's determination that he "induced [the wife] to return to the marriage following [the] physical assault."

We agree that there is no evidence to support the court's finding that the husband "induced [the wife] to return to the marriage following [the] physical assault." At trial, the wife testified that she returned to the home following the assault because "[her] children were still young," "[t]hey didn't know why their mother left," and the husband "explained to [the children] that he had done something wrong." We have not found, and the wife has failed to provide, any evidence that supports the court's deduction from this testimony that there was "inducement." Because this finding was clearly erroneous and was central to the court's decision regarding alimony, we vacate the award and remand.

The husband also contends that the court should not have considered his conduct because the parties stipulated to a divorce on irreconcilable differences grounds and the court adopted their stipulation. Pursuant to RSA 458:7-a (Supp. 2007), parties are entitled to a no-fault divorce if "irreconcilable differences . . . have caused the irremediable breakdown of the marriage." The intent of this statute is to permit parties to dissolve their marriage, while "minimiz[ing] the acrimony attending divorce proceedings." *Murphy v. Murphy*, 116 N.H. 672, 673 (1976). Because this purpose could be defeated should a party offer evidence of fault in a no-

fault divorce, we held in *Murphy* "that in a divorce under RSA 458:7-a . . . the trier of fact may properly in [its] discretion exclude evidence of fault on the issue of alimony." *Id.* at 674.

We later broadened our interpretation of RSA 458:7-a in *Chabot v. Chabot*, 126 N.H. 793, 795 (1985). There, we stated that, when a "court grants a divorce on the ground of irreconcilable differences, fault would not be considered on the questions of property division or alimony." *Id.*; *see also Boucher v. Boucher*, 131 N.H. 377, 379 (1988) ("[E]vidence of fault may be considered in an award of alimony or division of property if a fault ground is proven to be the primary cause of the marital breakdown." (quotation omitted)). This rule is in accord with the alimony statute itself, which limits consideration of fault to cases where fault was the basis of the divorce and caused the breakdown of the marriage. *See* RSA 458:19, IV(b) (adopting the definition of fault provided by RSA 458:16-a, II(l) (2004); *to wit*, "the fault of either party as specified in RSA 458:7 [the fault-based divorce statute] if said fault caused the breakdown of the marriage").

In the instant case, the court stated that it was permitted to consider the "underlying circumstances giving rise to the divorce" and proceeded to recite the following:

> [The husband] testified that he knew at least five years, and maybe as much as ten years, prior to the separation that he intended to divorce [the wife]. This was near to the time that he induced [the wife] to return to the marriage following a physical assault upon her. Had he shared this information with [the wife] in a timely way, she might have been better able to secure other employment that would give her greater income and a more substantial retirement in old age. His failure to share this information, and his inducement for her to return to the marriage, has impeded her ability to be self sufficient. Even if she were to return to school at a cost of $13,000 to $15,000 over two to three years, she could not receive a master's degree soon enough to have a vested pension. Additionally, [the wife] had a reasonable expectation that support from [the husband]'s parents would continue. The Court concludes that [the wife] is in need of alimony.

The husband's argument is essentially that consideration of these "underlying circumstances" was tantamount to consideration of fault. A similar argument was put forward by the defendant in *Boucher*, 131 N.H. at 379-80. In that case, a marital master granted divorce on irreconcilable differences grounds, but nevertheless cited the defendant's "conduct

throughout the marriage" as support for its decision to award the parties' primary residence to the plaintiff. *Id.* at 379. On appeal, the defendant argued that the master's consideration of such conduct was indistinguishable from consideration of fault. *Id.* The plaintiff, in contrast, asserted that the master's reference to "conduct throughout the marriage" referred to the defendant's vacating of, and loss of interest in the home. *Id.* She argued that the master had not erred because such disinterest could be relevant on the issue of a party's contribution and attachment to an asset. *Id.* at 379-80. We acknowledged that the defendant's "conduct" could have been used by the master for both the impermissible purpose of analyzing fault, and for the permissible purpose of ascertaining his contribution to the home. *Id.* at 380. Because we could not determine from the record what "conduct" the master had considered, we remanded the case. *Id.*

■ Here, as in *Boucher*, the court's discussion of the husband's conduct could be construed in several ways. The court could have been considering the husband's conduct as relevant to its ultimate determination that the wife has an "impeded ... ability to be self sufficient." Such use of the husband's conduct would be permissible because the court was required to consider "the party in need['s] ... [ability] to be self-supporting" prior to awarding alimony. RSA 458:19, I(c). But, it is also possible that the court believed that it had the discretion to consider what it thought to be each party's fault in the breakdown of the marriage, as intimated from its statement that it could consider the "circumstances giving rise to the divorce." If that is the case, the court was in error. Because we cannot determine from the record in precisely what fashion the court considered the husband's conduct, we must remand. *Boucher*, 131 N.H. at 380.

*B. Annual Cost of Living Increase*

The husband contends next that the court erred by subjecting the alimony award to an annual cost-of-living increase. Specifically, he argues that, because an alimony award can only be modified "upon a proper showing of changed circumstances," *In the Matter of Arvenitis & Arvenitis*, 152 N.H. 653, 655 (2005), it cannot be made subject to the consumer price index, which is unrelated to the financial circumstances of the parties. *See* RSA 458:19. We agree.

While we have not yet had occasion to consider this precise issue, we recently held that child support awards cannot be made subject to automatic cost-of-living escalators in *In the Matter of Donovan & Donovan*, 152 N.H. 55, 64-65 (2005). There, the parties had agreed to a uniform support order that required the father to pay child support,

"subject to annual adjustment for inflation using the Consumer Price Index." *Id.* at 56. Three years later, the father filed a petition to modify the support order, arguing, among other things, that the consumer price index provision must be stricken as contrary to RSA 458-C:3, II(a) (2004), which provides the computations used in calculating a child support award. *Id.* at 57. After examining RSA 458-C:3, II(a), we noted that the child support guidelines generally require a "trial court to set prospective support based upon [the parents'] current income figures." *Id.* at 64. From this, we concluded that the use of the consumer price index as a mandatory escalator was "inconsistent with the child support guidelines because it requires adjustments to the [payor]'s support obligation that are independent of actual changes in the parties' incomes." *Id.* at 65.

The rationale underlying our holding in *Donovan* is equally applicable in this case. As noted above, in determining the amount of alimony to be awarded, the court must consider such factors as the "length of the marriage; the age, health, social or economic status, occupation, amount and sources of income, the property awarded . . ., vocational skills, employability, estate, liabilities, and needs of each of the parties." RSA 458:19, IV(b). All of these enumerated factors pertain to the financial and personal circumstances of the actual divorcing parties. In this way, RSA 458-C:3, II(a) and RSA 458:19, IV(a) are similar. *See Donovan*, 152 N.H. at 64 (explaining how RSA 458-C:3, II(a) requires the court to analyze the parties' actual incomes in making a child support award).

■ The consumer price index, in contrast, is intended to provide a general overview of "the price of goods and services purchased by the average consumer." BLACK'S LAW DICTIONARY 335 (8th ed. 2004). While this information may be useful in ascertaining the effect of inflation on the macroeconomic condition of a large geographic area, it does not necessarily shed light on the realities of individuals. It cannot be presumed that inflation will perforce affect the financial condition of every divorced couple. Consequently, it cannot be presumed that inflation will affect the equities of an alimony award. *See Waldman v. Waldman*, 520 So. 2d 87, 89 (Fla. Dist. Ct. App. 1988) (explaining that "there must be a showing that the national problem of inflation impacts specifically on the individual" requesting modification of an alimony award before such modification can be granted), *receded from on other grounds by Acker v. Acker*, 821 So. 2d 1088 (Fla. Dist. Ct. App. 2002). Because RSA 458:19, IV(b) requires alimony awards to be based upon the condition of the actual parties, and not solely the economy at large, the trial court erred by making the alimony award subject to the consumer price index. *See Donovan*, 152 N.H. at 64-65; *see also Barham v. Barham*, 487 S.E.2d 774, 781 (N.C. Ct.

App. 1997) (holding that an alimony recipient is not entitled to an automatic cost-of-living increase based upon the consumer price index); *Stoler v. Stoler*, 376 So. 2d 253, 254 (Fla. Dist. Ct. App. 1979) (finding error where a trial court inserted a provision in an alimony award providing for an automatic cost-of-living increase); *cf. Tillman v. Tillman*, 791 So. 2d 285, 288-89 (Miss. Ct. App. 2001).

### C. Award of Alimony for Life

The husband next challenges the duration of the alimony award. He contends that the court erred in finding, on this record, that an award of alimony for life was warranted. Moreover, he argues that we must reverse because the court failed to state a basis for its decision to make alimony payments permanent. We agree.

■ It has long been recognized that the primary "purpose of alimony is rehabilitative." *E.g., Tishkevich v. Tishkevich*, 131 N.H. 404, 407 (1989); *see also* RSA 458:19, I(c) (requiring that a trial court find, prior to awarding alimony, that the recipient is "unable to be self-supporting through appropriate employment"). This principle is based upon the realization that "modern spouses are equally able to function in the job market and to provide for their own financial needs." *Fowler*, 145 N.H. at 520. Alimony should, therefore, generally be "designed to encourage the recipient to establish an independent source of income." *In the Matter of Harvey & Harvey*, 153 N.H. 425, 431 (2006), *overruled on other grounds by In the Matter of Chamberlin & Chamberlin*, 155 N.H. 13, 15-16 (2007).

■ However, the express language of the alimony statute dictates that alimony awards need not be rehabilitative in all cases. *See* RSA 458:19, I (providing for alimony awards that are "either temporary or permanent, for a definite or indefinite period of time"); RSA 458:19, IV (mandating consideration of multiple factors when calculating the amount of an alimony award). Because of this, we have held that the rehabilitative principle is not controlling where, for instance: (1) the supported spouse suffers from ill health and is not capable of establishing her own source of income, *see Henry v. Henry*, 129 N.H. 159, 162 (1987); (2) the supported spouse, in a fault-based divorce, has minimal job experience, no formal education, a learning disability and suffers from anxiety and panic attacks caused by the other spouse's emotional abuse, *see In the Matter of Letendre & Letendre*, 149 N.H. 31, 39-40 (2002); and (3) the court determines that it is necessary for the supported spouse to maintain a part-time work schedule in order to care for the parties' child, *see In the Matter of Hampers & Hampers*, 154 N.H. 275, 284-85 (2006). In such cases, the court is permitted to provide for more than rehabilitative

alimony because the supported party lacks the wherewithal to enter "the job market and ... provide for their own financial needs," *Fowler*, 145 N.H. at 520, as those needs have been shaped by the parties' lifestyle during the marriage. *See* RSA 458:19, I(a), (c); *Harvey*, 153 N.H. at 431.

■ We disagree with the trial court's conclusion that the record justifies an award of alimony for life in this case. Unlike prior cases where we have found non-rehabilitative alimony to be justified, in this case the wife is in good health, *see Henry*, 129 N.H. at 162, has no minor children to support, *see Hampers*, 154 N.H. at 284, and has marketable job skills, *see Fowler*, 145 N.H. at 520, including a bachelor's degree. Moreover, the standard of living to which she has become accustomed, and which she will attempt to reproduce through her own means, is indisputably modest. *See id.* (finding an alimony award insufficient where the recipient was unlikely to "obtain a job which will allow her to maintain independently a standard of living comparable to that enjoyed during her marriage"). At the same time, the court found that the wife "is [currently] only working 24 hours per week" and "clearly has an ability to work more hours ... to become more self sufficient." We, therefore, reverse the court's award of permanent alimony as such an award is unwarranted by the record.

*D. Consideration of Parental Support*

The husband argues next that the court impermissibly considered the prospect that he would continue to receive support, particularly housing, from his parents in arriving at its alimony award. We agree with the husband that the court may have presumed that he would receive free housing in the future when it calculated his ability to pay alimony. Moreover, we agree with the husband that the court gave at least some weight to its belief that he will "be cared for financially by his parents." At issue, therefore, is whether it was proper for the court to consider the mere potentiality for receipt of such future support in its analysis.

Resolution of this question requires us to interpret the language and intent of the alimony statute, RSA 458:19. In so doing, we will ascribe the plain and ordinary meaning to the words used and discern the legislative intent from the statute as written. *ElderTrust of Fla. v. Town of Epsom*, 154 N.H. 693, 697 (2007). "We will not consider what the legislature might have said, or add language that the legislature did not see fit to include. However, we are the final arbiters of the legislature's intent as it is expressed in the words of the statute considered as a whole." *State v. Doyle*, 156 N.H. 306, 308 (2007).

At least facially, neither RSA 458:19, I, nor IV(b) grants a trial court explicit authority to consider a party's potential for receiving future gifts

in determining alimony. The wife argues, implicitly, that we should nevertheless uphold the trial court by reading such considerations into RSA 458:19, IV(b), which permits a trial court to consider "the opportunity of each [party] for future acquisition of capital assets and income." We decline to adopt such a broad interpretation of RSA 458:19, IV(b).

By factoring in the husband's mere expectancy of future gifts, the court "anticipated, indeed counted on, continuation of a state of affairs beyond the control of the affected spouse, . . . and even impinged on the freedom of his [parents], who [were] not party to the proceeding, to use and dispose of [their] property as [they] see[] fit." *Gassaway v. Gassaway*, 489 A.2d 1073, 1077 (D.C. 1985) (holding that the potential receipt of future gifts cannot be considered in dividing marital assets). Such an approach is problematic because, as the Supreme Court of Connecticut aptly observed:

> The expectancy may never be realized because of diminution of the donor's wealth or a change in the planned disposition of his property . . . . Relying upon such an [expectancy], a court may assume that adequate provision has been made for a needy spouse and neglect to provide more dependable means of support, such as a sufficient periodic alimony order or a greater share of assets owned at the time of the decree . . . . Any prediction of what justice between the parties may require when a future event may occur is likely to be less well considered than a determination made after the event, when speculation as to the circumstances involved has been supplanted by actuality.

*Rubin v. Rubin*, 527 A.2d 1184, 1189-90 (Conn. 1987). For these reasons, we concur with those courts that have held that a party's mere expectation of receipt of a future gift cannot be considered when making an alimony award. *See id.*; *Scott v. Scott*, 645 S.W.2d 193, 198 (Mo. Ct. App. 1982) (holding that a trial court is not required to consider "such an uncertain source of funds as future gifts" in making an alimony award); *Mumma v. Mumma*, 280 A.2d 73, 76 (D.C. 1971). "Of course, if the legislature disagrees with our construction of its statutory scheme, it is free to amend the statutes as it sees fit." *Marceau v. Concord Heritage Life Ins. Co.*, 149 N.H. 216, 221 (2003). Therefore, to the extent that the court considered the husband's potential receipt of future gifts from his parents, it was in error.

The wife asserts, alternatively, that the court did not consider the housing as a gift, but rather as a wage supplement. *See Thayer v. Thayer*, 119 N.H. 871 (1979), *superseded by statute on other grounds as stated by In the Matter of Clark & Clark*, 154 N.H. 420, 425 (2006). Admittedly, this is at least a plausible interpretation of the court's order, in light of its

statement that the husband's "effective income is higher than he reports, given that he receives the benefit of housing from his parents." However, the court did not make findings on the value of the housing or explain in what way, or to what extent, the husband's reported income was increased. Indeed, the court only stated that "the $900 which [the husband] claims he is paying as rent c[an] be applied towards alimony for [the wife]." We are unable to reconcile these two findings, as one suggests the housing was treated as a credit to the husband's income (or a wage supplement), and the other suggests the housing was treated as a debit to the husband's reported expenses. Moreover, our confusion is further exacerbated by the court's discussion of the reasonableness of the wife's beliefs that the husband's "parents would have continued to provide housing at no expense for the duration of the parties' lives" and that the husband "expects to be cared for financially by his parents." Because we are unable to determine from this record precisely in which way the court considered the housing provided to the couple, we must remand for the trial court to make specific findings on this issue. *See Calderwood v. Calderwood*, 114 N.H. 651, 653 (1974) (explaining how "the husband's ability to pay is a vital factor to be considered by the court").

### E. Remaining Arguments

Finally, the husband argues that the court's decision evinces a bias and animus against him. However, his brief fails to demonstrate that he preserved this argument by raising it in the trial court. Moreover, the record does not indicate that the husband filed a motion to disqualify or recuse the trial judge. We generally do not consider issues raised on appeal that were not presented to the court below. *See State v. McAdams*, 134 N.H. 445, 447 (1991). This preservation requirement recognizes that, ordinarily, trial courts should have an opportunity to rule upon issues and to correct errors before they are presented to the appellate court. *State v. Bain*, 145 N.H. 367, 370 (2000). Because no such opportunity for consideration was given here, we decline to address this argument. *State v. Szczerbiak*, 148 N.H. 352, 356 (2002).

The husband offers several additional arguments in his brief, all of which rely, at least in part, upon the parties' specific financial information and the trial court's computations involving that information. While we agree that some of the financial figures provided by the husband in his brief appear to cut against the amount of alimony awarded in this case, we do not have before us the actual financial affidavits that were filed by the parties in accordance with Superior Court Rule 197. *See Murphy*, 116 N.H. at 675; *Economides v. Economides*, 116 N.H. 191, 195 (1976); *In the Matter of Levreault & Levreault*, 147 N.H. 656, 658 (2002). Since we are

vacating the alimony award in its entirety, the husband may present his arguments to the trial court should it again determine upon remand to award alimony to the wife.

*Vacated and remanded.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.