NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court – Nashua Family Division
No. 2014-133


IN THE MATTER OF ROBERT KEMPTON AND PEGGY KEMPTON

Argued:  May 7, 2015
Opinion Issued:  June 25, 2015


William Aivalikles, of Nashua, by brief and orally, for the petitioner.


Primmer Piper Eggleston & Cramer, PC, of Manchester (Doreen F. Connor on the brief and orally), for the respondent.


DALIANIS, C.J.  The petitioner, Robert Kempton, appeals, and the respondent, Peggy Kempton, cross-appeals, their final divorce decree entered by the Circuit Court (Introcaso, J.).  In his appeal, the petitioner argues that the trial court erred by denying his request for a fault-based divorce.  He also challenges the trial court's alimony award and property distribution.  In her cross-appeal, the respondent likewise challenges the trial court's alimony award and property distribution.  In addition, she argues that the trial court violated her constitutional right to due process by denying her request for a continuance and "forc[ing] her to appear at the parties' two[-]day divorce trial by telephone."  We affirm.

The pertinent facts are as follows.  When the parties divorced, the petitioner was a 56-year-old airline pilot, earning approximately $160,000 annually, and the respondent was a 57-year-old inmate, incarcerated in a

Massachusetts prison after having pleaded guilty to numerous counts of larceny and credit card fraud.

The parties were married in 1986. Their three children are now adults. In 1997, the parties moved from Georgia to Harvard, Massachusetts, where the respondent was hired as an executive by Fruitlands Museum. In 1998, they purchased a home in Hollis because they anticipated moving there. For the next ten years, however, while the respondent and the children lived in a rented home on the museum property in Massachusetts and the children attended Massachusetts schools, the petitioner lived in Hollis and the respondent and the children spent their weekends with him there. In approximately 2003, the parties purchased land in Georgia.

The respondent continued to work at the museum until early 2008, when she left her employment after having embezzled approximately $1.3 million. In June 2009, the respondent was indicted on, among other charges, 14 counts of larceny. In August 2010, she and the parties' adult children were also named as defendants in a civil suit the museum brought for misusing museum credit cards. As a result of the indictments, the respondent was evicted from the museum rental property.

The parties hired an attorney to represent the respondent and their children, initially paying him $40,000 for his services. In approximately July 2008, the attorney asked for an additional $60,000. In August 2008, the parties entered into a postnuptial agreement awarding the petitioner the Hollis home, the Georgia real estate, and his retirement accounts in return for paying the attorney a total of $100,000. The petitioner used some of his retirement money and obtained a home equity loan on the Hollis property to pay the attorney the remaining $60,000. The petitioner estimates that he has spent approximately $326,000 as a direct result of the respondent's criminal conduct. The petitioner testified that, as a result of the respondent's criminal conduct, of which he was unaware, he was "wiped out" financially and had to file for bankruptcy.

After the respondent was indicted, but before she was convicted, the petitioner paid $42,353 of the approximately $150,000 the respondent owed in credit card debt. As a result of a mistake made by the credit bureaus, the respondent's credit card debt adversely affected the petitioner's credit score. Moreover, the respondent established credit in the petitioner's name and, allegedly, without his consent, electronically signed his name to loan documents.

In June 2010, the respondent pleaded guilty to all of the criminal charges and was sentenced to serve three-to-five years in a Massachusetts state prison. She was also ordered to pay restitution to the museum in the amount of $1,338,791. To secure this debt, the museum attached the parties'

2

Hollis home. The Hollis home was also attached by a credit card company as a result of the respondent's unpaid credit card debt. The petitioner testified that the Hollis home "went into foreclosure" in May 2013.

In July 2011, the petitioner filed a petition for divorce based upon irreconcilable differences. In September 2011, the respondent filed a cross-petition alleging certain fault grounds for divorce. In response, the petitioner amended his petition to include, among other fault grounds, the fault ground of a spouse's imprisonment for more than one year. See RSA 458:7, IV (2004).

The final hearing on the parties' divorce petitions was scheduled to take place in October 2013. In August 2013, the respondent moved for a continuance until "after December 17, 2013," when she was scheduled to be released from prison. Although the respondent had counsel, she asserted that her inability to "be present in person" at the final hearing "would make it impossible for her to represent herself properly." The trial court denied the respondent's motion, stating that if she "wish[ed] to 'appear,'" she should "make appropriate arrangements." The respondent did not ground her motion in a constitutional provision or doctrine.

The respondent moved for reconsideration, asserting that she was "not able to appear or to make arrangements regarding same as the Massachusetts prison system will not allow her to make arrangements to attend a hearing out of state." The respondent contended that unless the trial court granted her request for a continuance, she would "not be able to attend her own divorce hearing" and would be "denied her right to appear before the Court and to understand and hear everything that will proceed." She asserted that this would deny her "a fair and equitable hearing in her divorce matter." Again, the respondent did not refer to a constitutional provision or doctrine.

It was not until the hearing on the motion to reconsider that the respondent used the phrase "due process," arguing that denying her a continuance deprived her of her "due process" right to "get to see [her] accuser" and to "get to see and hear everything that is going on."

The trial court denied the respondent's motion to reconsider, observing that she had counsel and had appeared telephonically in prior proceedings. The trial court stated that it had "no authority to order the Commonwealth of Massachusetts to produce [the respondent] for trial." The trial court explained that "if the [r]espondent chooses to be present at her hearing, she may, with the assistance of her counsel, make arrangements to appear telephonically to hear the evidence in this matter and testify on her own behalf."

Thereafter, the respondent filed a motion requesting permission from the trial court to file an interlocutory appeal from the court's ruling in which she again argued that the trial court had deprived her of due process by denying

3

her motion for a continuance, although she did not cite a specific constitutional provision. See Sup. Ct. R. 8. She also filed a motion to appear telephonically at the merits hearing, which the trial court granted.

The trial court denied the respondent's motion for permission to file an interlocutory appeal because it disagreed with her assertion that "[she] has a due process right to be physically present at these proceedings," given that she "is currently incarcerated in the State of Massachusetts[,] . . . is represented by counsel[,] . . . has participated in all phases of the[ ] proceedings[,] and has routinely appeared telephonically." The court explained that to delay the divorce hearing further would not be equitable to the petitioner, who filed his petition in July 2011, more than two years earlier. The court observed that, although the respondent's attorney represented that the respondent would be paroled in mid-December 2013, she had been denied parole in the past, and her maximum release date was not until "well into 2014." The court also noted that it had already granted the respondent's motion to appear telephonically. Accordingly, the final hearing took place, as originally scheduled. The respondent was represented by counsel and participated by telephone.

Following the merits hearing, the trial court granted the parties a divorce on the grounds of irreconcilable differences, after concluding that neither had proved the alleged fault grounds. Upon considering the factors set forth in RSA 458:19 (Supp. 2014), the court ordered the petitioner to pay the respondent $2,850 in monthly alimony for 96 months or until her remarriage or death, whichever occurs first. The court determined an unequal apportionment of the parties' retirement assets to be equitable, awarding the petitioner 2/3 and the respondent 1/3 of the petitioner's individual retirement account and defined benefit pension plan benefits (accrued between the date of the parties' marriage and the date of the petition for divorce). The court awarded the petitioner the Hollis home and awarded the respondent the Georgia real estate. Both parties filed motions for reconsideration, which were denied in all parts relevant to this appeal. This appeal and cross-appeal followed.

A trial court has broad discretion in fashioning a final divorce decree and in managing the proceedings before it. In the Matter of Spenard & Spenard, 167 N.H. 1, 3 (2014). We will not overturn a trial court's rulings absent an unsustainable exercise of discretion. Id. This means that we review the record only to determine whether it contains an objective basis upon which to sustain the trial court's discretionary judgment. Id. If the trial court's findings can reasonably be made on the evidence presented, they will stand. Id.

I. Due Process

We first consider the respondent's contention that, by denying her a continuance and "forc[ing] her to appear" at the merits hearing "by telephone," the trial court deprived her of her constitutional right to due process. This

contention raises a question of law, which we review <u>de novo</u>. <u>See</u> <u>In the Matter of Kalil & Buzderewicz</u>, 156 N.H. 254, 255 (2007).

Before addressing the merits of the respondent's argument, we make the following observations. First, to the extent that she argues that the trial court erred by not allowing her to proceed by videoconferencing, the respondent has not preserved this argument for our review. The respondent never requested to participate in the merits hearing by way of videoconferencing. Indeed, she specifically informed the trial court that she did <u>not</u> want to appear through a videoconference. In her response to the petitioner's objection to her motion for permission to file an interlocutory appeal, the respondent told the court that "[v]ideo conferencing is not an option" and that "[e]ven if it were an option, it would be inadequate" because it "would not allow [her] and her attorney to effectively consult during the hearing." Similarly, to the extent that the respondent now argues that the trial court erred by only allowing her to participate in the merits hearing by telephone, we observe that she specifically requested that relief. Therefore, we limit our analysis to the trial court's denial of the respondent's request for a continuance.

The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court. <u>State v. Addison</u>, 160 N.H. 792, 795 (2010). We will not overturn that decision unless it constitutes an unsustainable exercise of discretion, <u>id.</u>, and the party seeking the continuance "demonstrates that the decision [is] clearly unreasonable to the prejudice of [her] case." <u>In the Matter of Sawyer & Sawyer</u>, 161 N.H. 11, 18 (2010) (quotation omitted).

We consider the respondent's due process argument under the Federal Constitution only because she has failed to demonstrate that she preserved an argument under the State Constitution. <u>See</u> <u>Bean v. Red Oak Prop. Mgmt.</u>, 151 N.H. 248, 250 (2004). To preserve a state constitutional claim, the respondent had to: (1) raise it in the trial court; and (2) specifically invoke a provision of the State Constitution in her brief. <u>State v. Dellorfano</u>, 128 N.H. 628, 632 (1986). The respondent's mere reference to "due process" at the hearing on her motion to reconsider the denial of her motion for a continuance was insufficient to preserve a state constitutional claim for our review. <u>See</u> <u>In the Matter of Hampers & Hampers</u>, 154 N.H. 275, 291 (2006). The respondent's due process argument in her motion for permission to file an interlocutory appeal was also insufficient to preserve a state constitutional claim for our review. <u>Cf.</u> <u>Cross v. Brown</u>, 148 N.H. 485, 485, 487-88 (2002) (holding that appellant's argument in interlocutory appeal that she was entitled to recover attorney's fees and costs incurred in criminal proceeding was not preserved when she failed to raise this claim in the criminal proceeding). Thus, we confine our analysis to the Federal Constitution.

The respondent's due process argument proceeds from the mistaken premise that she has a federal due process right to appear personally at her

divorce hearing.  The Fourteenth Amendment to the United States Constitution reads, in part, that a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV.  The United States Supreme Court has held that access to courts is an element of due process.  See Boddie v. Connecticut, 401 U.S. 371 (1971); see also Logan v. Zimmerman Brush Co., 455 U.S. 422, 429 (1982) (explaining that the Federal Due Process Clause protects "civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances").

The constitutional right of access to courts extends to prison inmates, but only under certain circumstances.  See Bounds v. Smith, 430 U.S. 817, 821-22 (1977); see also Lewis v. Casey, 518 U.S. 343, 355 (1996).  Under the Federal Constitution, "[p]risoners have a constitutional right of access to the courts that affords them access to the tools necessary to challenge their criminal cases, criminal convictions and sentences directly or collaterally, to file habeas petitions, or to challenge the conditions of their confinement through nonfrivolous civil rights actions."  Feeley v. New Hampshire, No. 09-cv-432-JL, 2010 WL 4774274, at *4 (D.N.H. Aug. 20, 2010); see Lewis, 518 U.S. at 355; see also Ball v. Hartman, 396 F. App'x 823, 825 (3d Cir. 2010) (holding that inmate's constitutional right of access to courts did not extend to child support action because such an action was unrelated to her criminal sentence and conditions of her confinement); Simmons v. Sacramento County Superior Court, 318 F.3d 1156, 1159-60 (9th Cir. 2003) (explaining that prisoner has no constitutional right of access to courts to litigate a personal injury claim unrelated to conditions of confinement).  But cf. Vincent v. MacLean, 166 N.H. 132 (2014) (concluding that conducting bench trial by way of videoconferencing did not violate any federal due process right of access to courts to litigate his small-claims action that inmate may have had, without deciding that inmate did, in fact, have such a due process right).  "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  Lewis, 518 U.S. at 355.  As the Court has explained, "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," including "the otherwise unqualified right . . . to parties in all the courts of the United States to plead and manage their own causes personally."  Price v. Johnston, 334 U.S. 266, 285–86 (1948) (quotation and citation omitted), overruled on other grounds by McCleskey v. Zant, 499 U.S. 467 (1991).

Even when inmates have a federal constitutional right of access to courts, "[i]t is well established that [they] do not have an absolute constitutional right to be present in their own civil actions."  Cook v. Boyd, 881 F. Supp. 171, 175 (E.D. Pa. 1995), aff'd without opinion, 85 F.3d 611 (3d Cir. 1996); see, e.g., In re Wilkinson, 137 F.3d 911, 914 (6th Cir. 1998) (holding that prisoners who bring civil actions "have no right to be personally present at any stage of the judicial proceedings" (quotation omitted)); Michaud v.

6

<u>Michaud</u>, 932 F.2d 77, 81 (1st Cir. 1991) (finding that courts may exercise discretion in allowing prisoners to attend civil court proceedings initiated by the prisoner and that "[u]nder some circumstances, a prisoner may be forced to forego the right to appear personally in civil lawsuits"); <u>Fruit v. Norris</u>, 905 F.2d 1147, 1150 n.6 (8th Cir. 1990) (rejecting inmates' argument that they had a constitutional right to be present during the district court civil proceedings); <u>Poole v. Lambert</u>, 819 F.2d 1025, 1028 (11th Cir. 1987) (holding that an inmate has no absolute right to be present at the trial of his civil action); <u>Matter of Warden of Wisconsin State Prison</u>, 541 F.2d 177, 180 (7th Cir. 1976) (explaining that although the Federal Due Process Clause "guarantee[s] access to the courts," it does not "grant a prisoner the right to attend court in order to carry on the civil proceedings which he initiates").

Rather, the determination of whether a prisoner-party in a civil action should appear personally in court for the trial of the action rests in the sound discretion of the trial court. <u>Velasquez v. City of Santa Clara</u>, No. 5:11-cv-03588-PSG, 2013 WL 6320849, at *3 (N.D. Cal. Dec. 4, 2013). "[A] writ of <u>habeas</u> <u>corpus</u> <u>ad</u> <u>testificandum</u> is the means for such individuals to be present in court." <u>Leeper v. Leeper</u>, 21 So. 3d 1006, 1010 (La. Ct. App. 2009); <u>see</u> <u>Latiolais v. Whitley</u>, 93 F.3d 205, 208 (5th Cir. 1996). In the instant case, the respondent never filed such a writ. <u>See</u> <u>In re Baby K.</u>, 143 N.H. 201, 204 (1998) (trial court did not unsustainably exercise its discretion by denying incarcerated parent's motions to stay termination of parental rights proceedings when parent never requested writ to compel his attendance). Moreover, on appeal, she agrees that, because she was incarcerated in Massachusetts, the New Hampshire trial court had no authority to compel her presence at trial.

Here, even if we assume, without deciding, that the respondent had a federal constitutional right to access the court to litigate her divorce action, and even if we assume, without deciding, that her motion to continue, was, in effect, a motion to be physically present at the merits hearing, we conclude that the trial court did not unsustainably exercise its discretion by denying that motion.

"Due process requires reasonable access to courts but not that a particular means of access be made available." <u>MacKay v. Crews</u>, No. 09-CV-2218 (JFB) (ARL), 2009 WL 5062119, at *12 (E.D.N.Y. Dec. 16, 2009). Generally speaking, in a case such as this one, if an inmate has an opportunity to appear through counsel and to present evidence and cross-examine witnesses in the trial, the Federal Due Process Clause is satisfied. <u>See</u> <u>Cook</u>, 881 F. Supp. at 175-76 (inmate prevented from participating by telephone in custody hearing not denied due process when represented by counsel and not prohibited from offering testimony through videotape or other recorded form or denied ability to cross-examine witnesses testifying against him); <u>see</u> <u>also</u> <u>Holloway v. Dobbs</u>, 715 F.2d 390, 392 (8th Cir. 1983) (per curiam) (holding

that prisoner failed to state a claim that he was deprived of his constitutional right to access courts when represented by attorney and attorney's access to court was not impaired).

State court decisions are in accord. See Cook, 881 F. Supp. at 175 (citing cases). "State courts . . . have repeatedly held that the due process rights of a prisoner who has been prohibited from participating in a [civil] hearing are not violated where the prisoner was represented by counsel and was neither denied an opportunity to present testimony in some form on his behalf nor denied the opportunity to cross-examine witnesses." Id.; see, e.g., Renusch v. Renusch, No. 275669, 2008 WL 1062104, at *2 (Mich. Ct. App. Apr. 10, 2008) (holding that trial court did not violate prisoner's due process rights by allowing him to participate in divorce hearing by telephone); In re Interest of Azia B., 626 N.W.2d 602, 608-10 (Neb. Ct. App. 2001) (mother's due process rights not violated by court's denial of request for a continuance and request to appear telephonically in termination of parental rights proceeding when she was incarcerated in another state and was represented by counsel at the proceeding); Matter of Adoption of J.M.H., 564 N.W.2d 623, 627 (N.D. 1997) (concluding, in civil case, that "[p]risoners' due process rights generally are satisfied if they are represented by counsel and have an opportunity to appear by deposition or other discovery technique").

In this case, the respondent was represented by counsel, who presented evidence on her behalf, including the testimony of a hostile witness, and vigorously cross-examined the petitioner (the only witness presented by opposing counsel). Additionally, the respondent testified on her own behalf and had opportunities to confer with her attorney during the hearing. On three occasions during the two-day hearing, the trial court cleared the courtroom to allow the respondent to confer with her counsel privately. The court did this before any evidence was presented, before the respondent's counsel began her cross-examination of the petitioner, and before opposing counsel began his cross-examination of the respondent. On a fourth occasion, the respondent was asked whether she wanted to consult with her counsel privately, but she declined. See State ex rel Juv. Dept. v. Stevens, 786 P.2d 1296, 1299 (Or. Ct. App. 1990) (no deprivation of due process in termination of parental rights proceeding when incarcerated parent "testified by telephone and was able to consult with his counsel in the same way" (footnote omitted)). Given these circumstances, even assuming that this case implicates the respondent's federal constitutional right to access courts, we cannot conclude that the trial court deprived her of that right or unsustainably exercised its discretion when it denied her motion for a continuance. See In re Interest of Azia B., 626 N.W.2d at 610 (court concludes that parent incarcerated out of state was not deprived of due process even though she was not present at, and did not participate telephonically in, her termination of parental rights hearing when her "counsel examined witnesses and presented evidence at the hearing").

Although the respondent argues that this case is governed by <u>Baby K.</u>, 143 N.H. 201, we disagree. First, we decided <u>Baby K.</u> under the State Constitution, while we are deciding the instant case under the Federal Constitution. <u>See Baby K.</u>, 143 N.H. at 203-04, 207; <u>see also</u> <u>State v. Ball</u>, 124 N.H. 226, 237 (1983) (concluding that because the defendant prevailed under the State Constitution, we need not reach his federal constitutional claim). Second, we disagree with the respondent that her due process rights are equivalent to those of the incarcerated parent in <u>Baby K.</u> The incarcerated parent in <u>Baby K.</u> was entitled to heightened due process protections because that case involved a termination of parental rights proceeding. <u>Baby K.</u>, 143 N.H. at 205. By contrast, in a divorce proceeding, the respondent is entitled only to the basic due process protections of notice and a meaningful opportunity to be heard. <u>See</u> <u>Boddie</u>, 401 U.S. at 377-79; <u>see also</u> <u>Douglas v. Douglas</u>, 143 N.H. 419, 423 (1999).

Moreover, the telephonic process used in this case was superior to that used in <u>Baby K.</u>. The respondent in this case, unlike the incarcerated parent in <u>Baby K.</u>, was able to participate meaningfully in the hearing. Here, the respondent had a telephonic connection to the courtroom, and was able to communicate directly with the court, with the witnesses, and with her own and opposing counsel. By contrast, in <u>Baby K.</u>, the incarcerated parent had only a telephonic connection to his trial counsel, requiring his attorney "to serve as an advocate and a conduit," which may have affected the attorney's ability to represent the parent. <u>Baby K.</u>, 143 N.H. at 207.

Although the respondent argues that the telephonic process used in this case was flawed because she was unable to hear at times and was unable to review some of the documents about which she was questioned, those flaws did not, in this case, deprive her of her federal constitutional right to due process. The record establishes that testimony and arguments were routinely repeated for the respondent.

With regard to exhibits, the trial court allowed the attorneys to use exhibits only as a means of refreshing a witness's recollection. The record demonstrates that the respondent had all of her own attorney's exhibits with her when she testified as well as two bankers' boxes full of other documents, and that her attorney's exhibits overlapped with some of those of opposing counsel. The record also establishes that, although opposing counsel delivered most of his exhibits to the respondent's attorney before trial, her attorney did not deliver them to the respondent. The record shows that, on the handful of occasions when opposing counsel questioned the respondent about a specific document that she could not locate, he represented what the document said, and her counsel did not object to that representation. Nor did her counsel object to the admission into evidence of any of opposing counsel's exhibits.

9

The respondent further contends that the telephonic process was flawed because it impeded the trial court's ability to "observe [her] demeanor and regret for her crime."  Although the trial court could not assess the respondent's credibility by observing her, the court could assess her credibility by listening to her.  We cannot say that this limitation upon the trial court's ability to assess the respondent's credibility deprived her of a federal constitutional right to due process.  Cf. In re Juvenile Appeal, 446 A.2d 808, 812 (Conn. 1982) (concluding that "limiting the opportunity to assess the respondent's demeanor to its auditory component . . . entail[ed] only the most marginal risk that the referee would be misled in evaluating the respondent's credibility").

To the extent that the respondent contends that she had a constitutionally-protected right to "face her husband and [another hostile witness] when they testified," we disagree.  There is no federal constitutional right of confrontation that applies to civil proceedings.  See Austin v. United States, 509 U.S. 602, 608 n.4 (1993); Emile v. I.N.S., 244 F.3d 183, 189 (1st Cir. 2001).

II.  Fault Grounds for Divorce

We next consider whether the trial court erred by denying the petitioner's request for a divorce on the fault ground that the respondent was incarcerated for more than one year.  See RSA 458:7, IV.  The cause of marital breakdown is a question of fact for the trial court.  See Yergeau v. Yergeau, 132 N.H. 659, 661 (1990); see also Hampers, 154 N.H. at 279.  We will uphold the trial court's factual findings unless the evidence does not support them or they are legally erroneous.  Hampers, 154 N.H. at 279.

RSA 458:7, IV provides that "[a] divorce . . . shall be decreed in favor of the innocent party for . . . [c]onviction of either party, in any state or federal district, of a crime punishable with imprisonment for more than one year and actual imprisonment under such conviction."  The trial court denied the petitioner's request for a fault-based divorce on this ground, in part, because it determined that there was insufficient evidence to establish that "such fault caused the . . . breakdown of the parties' marriage."  The court observed that, while the respondent was imprisoned, the petitioner visited her, sent her cards, and provided her with financial support.

The petitioner does not challenge these factual findings.  Rather, he argues that the trial court drew the wrong inference from them.  He contends that these facts do not indicate that the marriage continued despite the respondent's incarceration.  The petitioner also argues that additional facts support the inference that the respondent's incarceration caused the parties to be unable to "reconcile [their] marital issues."

10

Although the petitioner argues one reasonable inference from the facts, we cannot say that the trial court erred by drawing a different inference. Our standard of review is not whether we would rule differently than the trial court, but whether a reasonable person could have reached the same decision as the trial court based upon the same evidence. Cook v. Sullivan, 149 N.H. 774, 780 (2003). We will not substitute our judgment for that of the trial court. Brent v. Paquette, 132 N.H. 415, 419 (1989). Here, because we conclude that a reasonable person could have reached the same decision as did the trial court based upon the same evidence, we uphold the trial court's determination that the respondent's incarceration did not cause the breakdown of the parties' marriage.

III. Property Distribution

We next consider the trial court's property distribution. RSA 458:16-a, II (2004) creates a presumption that an equal distribution of marital property is equitable. Hampers, 154 N.H. at 285. Absent special circumstances, the court must make the distribution as equal as possible. Id. However, marital property is not to be divided by some mechanical formula but in a manner deemed "just" based upon the evidence presented and the equities of the case. Id. at 286 (quotation omitted).

The statute enumerates various factors for the court to consider, such as the length of the marriage, the ability of the parties to provide for their own needs, the actions of either party during the marriage which contributed to the growth or diminution in value of property owned by either or both of the parties, the contribution of each party during the marriage, and the value of property contributed by each party. RSA 458:16-a, II. Additionally, the court may consider "[a]ny other factor [it] deems relevant" in equitably distributing the parties' assets. RSA 458:16-a, II(o). The court need not consider all of the enumerated factors or give them equal weight. Hampers, 154 N.H. at 286. Because we afford trial courts broad discretion in determining matters of property distribution in fashioning a final divorce decree, we will not overturn the trial court's decision absent an unsustainable exercise of discretion. Id. at 285.

The petitioner argues that the trial court erred by failing to divide the marital estate according to the parties' postnuptial agreement. To the extent that he argues that the postnuptial agreement is enforceable, we agree with the respondent that he did not preserve this argument for our review. As the respondent correctly observes, in the trial court, the petitioner specifically contended that the postnuptial agreement was unenforceable.

To the extent that the petitioner argues that the trial court erred by failing to afford proper weight to the parties' postnuptial agreement, we decline his invitation to reweigh the evidence. See Cook, 149 N.H. at 780 (explaining that "we defer to the trial court's judgment on such issues as resolving conflicts

in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence").

The petitioner also argues that the unequal property distribution is "inequitable." He asserts that the "net effect" of both the property distribution and alimony award "is unconscionable when the [r]espondent's financial harm to the marital estate is properly considered." The respondent likewise contends that the unequal division of the parties' retirement assets is inequitable. She argues that "[d]espite the embezzlement, [the petitioner] continues to enjoy monthly earnings which can be as much as $20,000.00 a month through retirement," while, "[i]n sharp contrast," her own "future earnings will probably not exceed minimum wage."

Having reviewed the trial court's factual findings that led to its property distribution, we cannot say that its unequal distribution of the parties' retirement assets constitutes an unsustainable exercise of discretion. The record shows that the trial court considered the statutory factors in dividing the parties' assets, including those factors upon which the parties rely. See RSA 458:16-a, II(a)-(c), (f)-(i), (o). The record also supports the trial court's factual findings based upon those factors. Because the trial court's decision is supported by the record and because the parties have failed to persuade us that the trial court committed an error of law, we hold that its division of property constituted a sustainable exercise of discretion. See Hampers, 154 N.H. at 286. Although the respondent argues, in a single sentence, that it was inequitable for the trial court to have awarded the Hollis property to the petitioner, her argument is insufficiently developed for our review. See Stewart v. Bader, 154 N.H. 75, 78 (2006) (noting that a mere laundry list of complaints regarding adverse rulings by the trial court, without developed legal argument, is insufficient to warrant appellate review).

The respondent also argues that "[t]he only written finding cited by the [trial court] in support of its deviation from an equal distribution [of the parties' retirement assets] was its finding that [her] conduct during the marriage had substantially diminished the marital estate." The respondent contends that this written finding was insufficient to justify the unequal distribution of the parties' retirement assets because, when the trial court relied upon it, it "failed to consider the positive impact of [her] embezzlement of $1.3 million, against [the petitioner's] embezzlement-related expenses." The court, she contends, similarly "failed to consider [her] motives behind [the] embezzlement" and the petitioner's "post-divorce stature" as well as the fact that the respondent must pay restitution and income taxes associated with the embezzlement. By failing to consider these alleged facts, she contends, the trial court acted contrary to In the Matter of Martel & Martel, 157 N.H. 53, 59 (2008), in which we held:

12

[I]n applying RSA 458:16-a, II(f) to support an unequal distribution of assets due to a spouse's conduct which resulted in a diminution in value of property, a trial court must consider factors such as: conduct which contributed to the growth in value of property; the nature of the conduct; the other spouse's knowledge of the conduct; whether the conduct diminished the total marital assets to such an extent that the other spouse is unable to maintain a similar lifestyle following divorce; and any other factor the court deems relevant.

The respondent has failed to demonstrate that she preserved this argument for our review, as was her burden. See Bean, 151 N.H. at 250. To the extent that the respondent presented this issue to the trial court in a request for findings of fact and rulings of law, she has not provided that request as part of the appellate record. To the extent that she raised this argument in her motion for reconsideration of the final decree, she has not included that motion in the record on appeal. Accordingly, we decline to consider the merits of this argument.

IV. Alimony

We next review the trial court's alimony award. RSA 458:19, I, authorizes the trial court to award alimony if: (1) the party in need lacks sufficient income, property, or both to provide for her reasonable needs, considering the style of living to which the parties have become accustomed during the marriage; (2) the payor is able to continue to meet his own reasonable needs, considering the style of living to which the parties have become accustomed during the marriage; and (3) the party in need cannot be self-supporting through appropriate employment at a standard of living that meets reasonable needs. We review the trial court's decision to grant or deny a request for alimony under our unsustainable exercise of discretion standard. Hampers, 154 N.H. at 283.

In determining the amount of alimony, a trial court must consider: the length of the marriage; the age, health, social or economic status, occupation, amount and sources of income, the property awarded under RSA 458:16-a, vocational skills, employability, estate, liabilities, and needs of each of the parties; the opportunity of each for future acquisition of capital assets and income; the fault of either party as defined in RSA 458:16-a, II(l); and the federal tax consequences of the order. RSA 458:19, IV(b). Further, the court may consider the economic contribution of the parties to the value of their respective estates, as well as non-economic contributions to the family unit. See RSA 458:19, IV(d).

In awarding alimony to the respondent, the court found that, throughout the marriage, she had been the primary caretaker for the children and "the

13

lesser of the income earners." At the time of the divorce, she was employed only part-time, making "minimal . . . wages." The court determined that the respondent needed "immediate access to income for her most basic needs" and that the marital home was "as unaffordable as it is impractical in terms of providing an appropriate accommodation for her." The court found that "[a]lthough the [p]etitioner . . . is still working through the financial havoc that resulted from the [r]espondent's criminal acts and the breakdown of the marriage, he will most likely have the ability to recover financially, maintain a homestead for himself, and secure a comfortable retirement." The court also found that the petitioner has the ability to pay alimony given his "lucrative position" through which he grosses more than $14,000 per month. The record supports these findings.

The petitioner contends that the alimony award is "inconsistent with the primary purpose of [such] an . . . award," which we have held is rehabilitative. See In the Matter of Dube & Dube, 163 N.H. 575, 581 (2012). He asserts that rehabilitative alimony is not proper in this case because "the parties['] marriage did not affect the [r]espondent's ability to obtain the same or similar employment." This is not a requirement under New Hampshire law, and we decline the petitioner's invitation to adopt it as one.

The principle that the primary purpose of alimony is rehabilitative "is based upon the realization that modern spouses are equally able to function in the job market and to provide for their own financial needs." In the Matter of Nassar & Nassar, 156 N.H. 769, 777 (2008) (quotation omitted). "Alimony should, therefore, generally be designed to encourage the recipient to establish an independent source of income." Id. Here, awarding the respondent alimony for eight years, until she reaches the age of 65, is consistent with the rehabilitative purpose of alimony. As the trial court found, eight years is a "reasonable period of time for the [r]espondent to adjust to her revised standard of living, recover financially to the best of her ability, and pursue opportunities for her own job growth, financial independence and security."

The petitioner next argues that the alimony award was improper because the respondent's financial condition "was due to her deliberate criminal conduct." In effect, he argues that the trial court erred by failing to consider the respondent's fault when fashioning the alimony award. This argument is contrary to the alimony statute, which allows the trial court to consider the fault of either party only "as defined in RSA 458:16-a, II(l)." RSA 458:19, IV(b). RSA 458:16-a, II(l) provides that the fault of either party, "as specified in RSA 458:7," may be considered in distributing the parties' assets "if said fault caused the breakdown of the marriage" and the fault either "[c]aused substantial physical or mental pain and suffering" or "[r]esulted in substantial economic loss to the marital estate or the injured party." Here, although the respondent's conviction and prison sentence arguably qualified as "fault" under RSA 458:7, IV, the trial court could not consider it when fashioning the

14

alimony award because the court did not find that it "caused the breakdown of the marriage." RSA 458:16-a, II(l). Accordingly, we cannot say that the trial court unsustainably exercised its discretion by awarding the respondent alimony despite her criminal conduct.

In a related argument, the petitioner asserts that awarding alimony to the respondent violates public policy because it rewards her for her criminal misconduct and effectively requires him, as an innocent party, to pay the restitution that she owes for her crime. The petitioner makes this argument in the wrong forum. See Petition of Kilton, 156 N.H. 632, 645 (2007). "Matters of public policy are reserved for the legislature, and we therefore leave to it the task of addressing the petitioner's concerns," id., particularly given that alimony is a matter of statutory law.

Finally, the petitioner asserts that the alimony awarded to the respondent is unsupportable. The respondent, on the other hand, contends that the trial court erred by ordering that the alimony award would terminate after eight years. She also argues that the monthly amount is too low given her reasonable needs and the petitioner's ability to pay.

The parties misperceive our role on appeal. Our role is not to review the alimony award de novo, but to determine only whether there is an objective basis "sufficient to sustain the discretionary judgment made." State v. Lambert, 147 N.H. 295, 296 (2001) (explaining our unsustainable exercise of discretion standard). Here, the record supports the trial court's findings with regard to the alimony award. Moreover, given the parties' long term marriage, the respondent's education and skills, the fact that the parties' children are now adults, and the petitioner's income (despite his financial condition at the end of the marriage), we cannot say that a monthly alimony award of $2,850 for eight years is unreasonable as a matter of law. See In the Matter of Gordon and Gordon, 147 N.H. 693, 699 (2002) (affirming alimony award of $2,000 per month for the first two years after divorce and $1,000 per month for the following three years when husband earned approximately $13,000 monthly).

All issues raised in the notices of appeal and cross-appeal that were not briefed, are deemed waived. See In re Estate of King, 149 N.H. 226, 230 (2003).

Affirmed.

HICKS, CONBOY, LYNN, and BASSETT, JJ., concurred.

15