Department of Resources and Economic Development
No. 86-526

## APPEAL OF COASTAL MATERIALS CORPORATION

### (New Hampshire Department of Resources and Economic Development)

November 9, 1987

*Shaines & McEachern P.A.*, of Portsmouth (*Robert A. Shaines* on the brief and orally), for the plaintiff.

*Stephen E. Merrill*, attorney general (*Daniel J. Mullen*, assistant attorney general, on the brief, and *David S. Peck* orally), for the State.

JOHNSON, J. This appeal arises from the denial by the Commissioner of the New Hampshire Department of Resources and Economic Development (DRED) of plaintiff's application for a mining permit for a 310-acre tract of land which the plaintiff owns in Raymond. We reverse.

Plaintiff, Coastal Materials Corporation (Coastal), is a New Hampshire corporation whose Raymond property contains large microline granite outcroppings suitable for the extraction of granite. Coastal anticipated crushing the extracted granite so that it could be used as construction aggregate. On July 9, 1986, pursuant to RSA chapter 12-E, which governs mining and reclamation in New Hampshire, Coastal submitted to DRED an application for a mining permit. RSA 12-E:4 (Supp. 1986). On August 28, 1986, DRED, pursuant to RSA 12-E:5, conducted a public hearing to

determine whether Coastal's application should be granted. RSA 12-E:5 (Supp. 1986).

In the interim between July 9 and August 28, DRED Commissioner John T. Flanders consulted the office of the attorney general for advice regarding the effect upon Coastal's application of DRED's Administrative Rule Res-M 301.02 (formerly Res-F 301.02). Res-M 301.02 states: "The department declares that prospecting for and mining of rock to be broken and/or crushed for use by the construction industry are not within its permitting authority under RSA 12-E." Min. & Recl. Res-M 301.02. On July 23, 1986, the attorney general advised Commissioner Flanders that Res-M 301.02 "creates a gap in the regulatory structure" and "must be repealed." The attorney general observed that while RSA 12-E confers upon DRED express authority to regulate the mining of granite, that statute exempts from coverage "construction aggregate to be excavated from natural deposits [e.g., sand, gravel, soil] on or in the earth or in or underneath water."

Conversely, RSA chapter 155-E, which confers upon local officials (planning boards, selectmen or, in the case of unincorporated areas, county commissioners) express authority to regulate "excavations" of "earth," RSA 155-E:1, I, which means "sand, gravel, rock, soil or construction aggregate," exempts from coverage "excavation from a granite quarry." RSA 155-E:2, IV. Since Res-M 301.02 prohibits the State from regulating man-made construction aggregate under RSA chapter 12-E, and since RSA chapter 155-E prohibits localities from regulating "excavation from a granite quarry," id., the attorney general reasoned that if Res-M 301.02 remained in effect, man-made construction aggregate would be regulated by neither State nor local authorities.

Pursuant to the attorney general's advice, Commissioner Flanders promulgated an emergency rule on August 1, 1986, which, pursuant to RSA 541-A:3(g) (Supp. 1986), permitted DRED to authorize stone crushing as an accessory use to granite operations. Simultaneously, DRED repealed Res-M 301.02. The effect of that repeal was short-lived, however, because on October 29, 1986, the attorney general's office reversed its earlier position and advised DRED that Res-M 301.02 was a valid rule because all stone-crushing operations, even those which are accessory uses to granite quarrying, are governed exclusively by local authorities pursuant to RSA 155-E. The attorney general's October 29 opinion concluded that "if granite were being crushed and used as construction aggregate, the excavation site would not be considered a granite

quarry and regulation of the excavation site would be left to the municipality."

On October 31, 1986, Commissioner Flanders, having adopted the position stated in the attorney general's October 29 opinion, informed Coastal that "because the excavation [which Coastal had proposed] involved crushed rock for construction aggregate, a local permit, under the provisions of RSA 155-E, will be required rather than a mining permit under the provisions of RSA 12-E." On November 17, 1986, Coastal applied to Commissioner Flanders for a rehearing of its mining application. Commissioner Flanders replied that "[t]he request for a rehearing is denied because no decision was rendered by the Commissioner on the hearing held on August 28, 1986 in Raymond as it has been found that the proposed excavation must be the subject of a permit issued by the municipality; not the State of New Hampshire. The request to grant a permit to the Coastal Materials Company for a quarry operation in the town of Raymond is denied because the Department does not have jurisdiction in the matter." Coastal appeals the Commissioner's decision.

■■■ The principal issue in this case is whether RSA chapter 12-E confers upon the commissioner of DRED exclusive authority to regulate granite quarrying in New Hampshire. If the statute does confer such authority upon the commissioner, Administrative Rule Res-M 301.02 was unlawful, as is any administrative action taken on the assumption that the rule correctly reflected the law, because it clearly conflicts with the assignment to DRED of broad and exclusive control over mining, including granite-crushing. In determining legislative intent, inquiry begins with an examination of the statutory language. *In re Robyn W.*, 124 N.H. 377, 379, 469 A.2d 1351, 1352 (1983). The words in the statute itself are the touchstone of the legislature's intention. *Greenhalge v. Town of Dunbarton*, 122 N.H. 1038, 1040, 453 A.2d 1295, 1296 (1982).

■ Coastal argues that Res-M 301.02 should be vacated because it contravenes the legislature's intent that all mining activities in New Hampshire be regulated by State officials under the authority of RSA 12-E. We agree with Coastal that RSA 12-E clearly expresses a legislative intent that State authorities regulate, in a comprehensive fashion, all mining in New Hampshire, including granite quarrying from which is produced crushed stone to be used as construction aggregate. RSA 12-E:1, V specifically *includes* granite in its definition of "mineral" and specifically *excludes* "sand, gravel and construction aggregate to be excavated from *natural*

*deposits* on or in the earth or in or underneath water." RSA 12-E:1, V (Supp. 1986). (Emphasis added.) The statute defines "mining" as "the activities performed in the extraction of minerals including the excavation of pits, removal of minerals, disposal of overburden and the construction of roads for the haulage of mining materials . . ." RSA 12-E:1, VI (Supp. 1986). The statute defines "quarry" as "an excavation in bedrock open to the surface excavated for the purpose of removing rock, minerals or metallic ores." RSA 12-E:1, XII (Supp. 1986). In addition to referring specifically to granite and to quarrying in identifying the scope of its coverage, RSA 12-E makes several references to "blasting" and "blasting activities."

RSA 12-E:4, II stipulates that a "mining permit shall include a mining plan, a blasting plan if such activities are anticipated, and a reclamation plan." RSA 12-E:4, II (Supp. 1986). RSA 12-E:4, III requires that applications for mining permits include a copy of an insurance policy which affords protection for, among other things, "property damage, including blasting damage . . ." RSA 12-E:4, III (Supp. 1986). Finally, RSA 12-E:5, IV(f) requires all mining plans to include "a description of anticipated blasting activities during the mining operation . . ." RSA 12-E:5, IV(f) (Supp. 1986).

■■ While the language of RSA 12-E, then, expresses a clear intention that the crushing of granite be regulated by State authorities, RSA 155-E expresses an equally clear intention that the crushing of granite *not* be regulated by local authorities. RSA 155-E:1, IV specifically exempts from coverage "excavation from a granite quarry." RSA 155-E:1, IV (Supp. 1986). The statute makes no mention of blasting because it is designed to regulate the excavation of "earth," namely, "sand, gravel, rock, soil or construction aggregate," which exists in "natural deposits" and can therefore be shoveled, loaded into a truck and hauled away without the necessity for blasting. RSA 155-E:1, I (Supp. 1986). The specific references to "granite," "quarry" and "blasting" in RSA 12-E and the absence of those references in RSA 155-E indicate that, contrary to the view of DRED, the legislature intended that RSA 12-E would govern not only the extraction of dimensional stone, which is the current position of DRED, but also the crushing of granite for use as construction aggregate. By focusing upon the form which the granite in Coastal's operation would take, namely, crushed instead of dimensional, and upon the ultimate use for the granite, namely, construction aggregate instead of building stone, DRED erroneously concludes that RSA 12-E governs only dimensional stone. By focusing instead upon the nature of the ma-

terials in Coastal's operation and the clear legislative distinction between "minerals," as identified in RSA 12-E, and "earth," as identified in RSA 155-E, Coastal properly concludes that RSA 12-E governs all granite quarrying activities, including the crushing of the mineral for use as construction aggregate. We agree with Coastal that "a stone crusher is a valid accessory use to the extraction of rock, and is therefore not prohibited by local zoning ordinances relating to industrial uses, nor sufficient to remove granite quarries from state regulation under RSA 12-E."

 The respective legislative histories of RSA 12-E and RSA 155-E support Coastal's conclusion. To determine legislative intent, a court construing a statute must look to the apparent statutory purpose as disclosed by its language in light of its legislative history. *State v. Amato*, 115 N.H. 639, 641, 348 A.2d 339, 340 (1975). In the construction of a statute, it is proper to consider the previous state of the law, the circumstances which led to its enactment, and especially the evil or mischief which it was designed to correct or remedy. *Clough v. Clough*, 80 N.H. 462, 464, 119 A. 327, 328 (1922). In construing a statute, a court must seek, the specific intent of lawmakers and, once disclosed, it controls any generalized statements elsewhere as to the meaning of the words used. *Chagnon v. Union-Leader Corp.*, 104 N.H. 472, 477, 190 A.2d 721, 722 (1963). RSA 12-E was considered by the New Hampshire Legislature during its 1979 session as House Bill 425 and became law on August 24, 1979. During Senate consideration of H.B. 425, Senator Poulsen characterized it as "a very comprehensive bill." He added: "It is landmark legislation in the sense that it is the first time New Hampshire has had any mining legislation. It protects the State from open pits and that type of thing. It gives a permit system, grandfather procedure, it covers the whole field in excellent shape." N.H.S. JOUR. 1296 (1979). RSA 12-E was also considered by the legislature in 1977, as H.B. 543, but was not enacted that year. During the 1977 session, Senator Hancock observed:

> "At the present time the state has no legislation whatsoever which would affect a large mining proposal . . . Both the proponents of mining and those who are concerned about its effects agree that there is need for mining legislation. This bill is neither a pro-mining bill nor an anti-mining bill. What it does is to provide a simple, orderly mechanism within an existing agency allowing for the review of a mining plan."

N.H.S. JOUR. 2177–78 (1977).

RSA 155-E was considered by the 1979 legislature as House Bill 661. This bill's declaration of purpose states: "The purpose of this act [this chapter] is to grant municipalities the authority to cope with the recognized safety hazards which open excavations create; to safeguard the public health and welfare; to preserve our natural assets of soil, water, forests and wildlife; to maintain aesthetic features of our environment; to prevent land and water pollution; and to promote soil stabilization." Senator Poulsen observed that H.B. 661 "should help the landscape of New Hampshire to no end when the procedures outlined in this [bill] are formed." N.H.S. JOUR. 1289 (1979). It is clear that RSA 155-E provides municipalities with the tools necessary to regulate and reclaim unsightly and potentially dangerous gravel pits, while RSA 12-E provides DRED with the tools necessary to regulate the mining industry statewide. DRED's rule Res-M 301.02 blurs the substantial distinction which exists between the purposes of these two statutes.

Res-M 301.02 also ignores important issues of mining and reclamation policy which favor State regulation of mining operations. First, petitioner's granite quarry operations proposed for Raymond, New Hampshire, anticipate the removal of a significant portion of a granite mountain using explosives and removing approximately ten thousand tons of rock per week. This is precisely the sort of "large mining proposal," about which Senator Hancock was concerned, featuring explosives, substantial alteration of the natural environment and heavy use of nearby roadways by mining company trucks, that RSA 12-E, with its permit requirements, blasting regulations, buffer zones and reclamation expectations, is designed to govern. Indeed, RSA 12-E was enacted because the legislature anticipated a resurgence in New Hampshire's mining industry due to the increasing financial attractiveness of low grade ores, but had, to that point, passed "no legislation whatsoever which would affect a large mining proposal." N.H.S. JOUR. 2177–78 (1977). The legislature sought to spare localities from having to govern operations like Coastal's when it specifically excluded "excavation from a granite quarry" from the coverage of RSA 155-E. RSA 155-E:2, IV (Supp. 1986). While the scooping, loading and hauling of sand and gravel can reasonably be regulated by part-time public officials (town planning boards, selectmen, county commissioners) who have little or no professional staff, an operation as large, multi-faceted and environmentally consequential as Coastal's requires the comprehensive regulation by full-time professionals which is anticipated by RSA 12-E. In order to insure that mining in New Hampshire will be regulated comprehensively

and professionally, Res-M 301.02 must be vacated and the State must exercise jurisdiction over granite quarrying operations.

 Second, Res-M 301.02 threatens to create jurisdictional disputes between State and local regulators. Local authorities, forced by DRED's rule to regulate large operations such as Coastal's, could seek to have jurisdiction over such operations transferred to State authorities, as the reality of the regulatory burden becomes clear to the local officials. Localities seeking to relinquish this burden could contend that a particular activity is "mining" under RSA 12-E, while the State would argue that it is the excavation of construction aggregate and, therefore, a local responsibility. Moreover, since RSA 155-E does not specifically include the crushing of granite within the scope of its coverage, localities may well contend that granite-crushing operations are not a local responsibility. Thus, Res-M 301.02 threatens to produce either inadequate local regulation, or no regulation whatsoever, of granite-crushing operations. Both results are unacceptable. A statute will not be interpreted so as to produce an unjust and seemingly illogical result. *General Electric Co. v. Dole Co.*, 105 N.H. 477, 479, 202 A.2d 486, 488 (1964).

Coastal also maintains that "RSA 12-E grants to the New Hampshire Department of Resources and Economic Development sole authority over the granting of mining permits, thereby pre-empting local regulation of granite quarries through town zoning ordinances." In Coastal's view, Res-M 301.02 is unlawful because it violates the preemption doctrine, which states that ". . . no bylaw or ordinance shall be repugnant to the constitution or laws of the state . . ." RSA 47:17, XV.

 We conclude that Coastal's view is correct. We have said: "Local legislation is repugnant to State law when an ordinance or bylaw either expressly contradicts a statute or else runs counter to the legislative intent underlying a statutory scheme." *State v. Driscoll*, 118 N.H. 222, 224, 385 A.2d 218, 220 (1978); *see also Dover News, Inc. v. City of Dover*, 117 N.H. 1066, 381 A.2d 752 (1977). We have also said: "Towns may not regulate a field that the State has preempted." *Stablex Corp. v. Town of Hooksett*, 122 N.H. 1091, 1104, 456 A.2d 94, 101 (1982). *See also Wasserman v. City of Lebanon*, 124 N.H. 538, 542, 474 A.2d 994, 998 (1984); *Applied Chemical Technology v. Town of Merrimack*, 126 N.H. 45, 490 A.2d 1348 (1985). Res-M 301.02 would encourage local governments to enter a field which the State has preempted by enacting RSA 12-E. RSA 12-E is a preemptive statute which empowers DRED to

require mining permits, set safety standards, suspend or revoke permits, supervise the leasing of State lands to be used for mining, conduct inspections and investigations of mining operations and reclaim land when a mine operator has failed to do so. Res-M 301.02 is unlawful because it represents an attempt by a State agency to avoid exercising the regulatory responsibility which the legislature has delegated to it.

We conclude that Res-M 301.02 is unlawful. Therefore, we reverse the decision of DRED to deny a mining permit to Coastal Materials Corporation pursuant to that administrative rule and order that DRED consider Coastal's proposal for a granite quarry on the merits and issue an order on such proposal.

*Reversed.*

All concurred.