NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-southern judicial district
No. 2018-0171


FRED S. TEEBOOM

v.

CITY OF NASHUA

DANIEL MORIARTY

v.

MAYOR, CITY OF NASHUA & a.

Argued: May 8, 2019
Opinion Issued: July 2, 2019


Douglas, Leonard & Garvey, P.C., of Concord (Charles G. Douglas, III on the brief and orally), for plaintiff Fred S. Teeboom.


Office of Corporation Counsel, of Nashua (Steven A. Bolton and Dorothy S. Clarke on the memorandum of law, and Mr. Bolton orally), for the defendants.


LYNN, C.J. Plaintiff Fred S. Teeboom appeals an order of the Superior Court (Temple, J.) dismissing his claims for declaratory, injunctive, and

mandamus relief based upon the court's determination that the budget spending cap[1] in the Nashua city charter is unenforceable because it violates state law.  We affirm.

I.  Pertinent Facts

The trial court found the following facts.  The spending cap was added to the Nashua city charter in November 1993.  As quoted by the trial court, the spending cap provides:

> Recognizing that final tax rates for the City are set by the New Hampshire Department of Revenue Administration . . . the Mayor, the [Board of Aldermen], and all departments in the City . . . shall prepare their annual budget proposals and the [Board of Aldermen] shall act upon such proposals in accordance with the mandates in this paragraph.

> In establishing a combined annual municipal budget . . . for the next fiscal year, the Mayor and the [Board of Aldermen] shall consider total expenditures not to exceed an amount equal to the [combined annual municipal budget] of the current fiscal year, increased by a [specified] factor . . . .

> This provision shall not prevent the Mayor and [Board of Aldermen] from establishing a [combined annual municipal budget] below this limit.

> This provision shall not prevent the Mayor and the [Board of Aldermen] from appropriately funding any programs or accounts mandated to be paid from municipal funds by state and federal law.

(Brackets and ellipsis omitted.)

The Nashua city charter also outlines exemptions to the spending cap:

> The total or any part of principal and interest payments of any municipal bond, whether established for school or municipal purposes, may be exempted from the limitation defined in [the spending cap provision] upon an affirmative vote of at least ten (10) aldermen.  This decision shall be made annually.

> In addition, capital expenditures deemed necessary by the mayor and the board of aldermen, . . . may similarly be exempted

---

[1] Throughout this opinion we refer to spending caps and tax caps interchangeably.

from this limitation upon an affirmative vote of at least ten (10) aldermen.

In April 2017, by a vote of nine to six, the Nashua Board of Aldermen (board) passed an ordinance exempting the entire wastewater treatment fund from the combined annual municipal budget. Later that month, Nashua's mayor proposed a budget for fiscal year 2018 that, consistent with the ordinance, removed the wastewater treatment fund from the spending cap calculation. In so doing, the mayor did not adjust for the fact that the 2017 combined annual municipal budget included $8.1 million of wastewater treatment funds that were not included in the proposed 2018 combined annual municipal budget. This process had the effect of allowing the mayor to allocate a significant amount of additional funds to other areas without running afoul of the spending cap.

On the surface, the proposed 2018 combined annual municipal budget appeared to comply with the spending cap. The maximum allowable budget pursuant to the cap was $267,517,084, and the 2018 combined annual municipal budget was $265,598,979. Faced with a proposed 2018 combined annual municipal budget purporting to be $1,918,105 below the spending cap, the board voted, ten to five, to adopt that budget.

Thereafter, Teeboom brought the instant lawsuit against the City of Nashua (City), asking the trial court to enforce the spending cap provision on the ground that the ordinance exempting the wastewater treatment fund from the combined annual municipal budget violated that provision. Teeboom contended that the wastewater treatment fund does not qualify for exemption from the spending cap and that, even if it did, such an exemption may be made only by an annual vote of a supermajority of ten aldermen. Because the ordinance was adopted by only nine aldermen, Teeboom contended that, even if the wastewater treatment fund could be excluded from the spending cap, the ordinance was ineffective to accomplish this objective. Teeboom also asserted that the board's vote on the proposed 2018 budget did not amount to a vote to exempt the wastewater treatment fund from the spending cap because the vote was not labeled as such.

The City countered that the ordinance was validly enacted. Alternatively, the City argued that, even if the ordinance violates the spending cap, the 2018 budget is valid because a supermajority of the board impliedly voted to override the spending cap by adopting the mayor's proposed budget. The City also argued that Teeboom lacked standing to bring his action.

Following a bench trial, the trial court ruled that Nashua's spending cap is unenforceable because it does not contain an override provision as required by state law. See RSA 49-C:12, III, :33, I(d) (2012). The court found that the charter provision allowing a supermajority of the board to exempt from the

spending cap municipal bond and capital expenditures did not constitute the requisite override provision. The court decided that because the spending cap was unenforceable, it could not provide redress for Teeboom's alleged injury and, therefore, that he lacks standing to bring his claims. Having so ruled, the trial court dismissed Teeboom's action. This appeal followed. Plaintiff Daniel Moriarty, whose separate action challenging the ordinance and the 2018 budget was consolidated in the trial court with Teeboom's action, has not appeared in this appeal.

## II. Analysis

### A. Teeboom's Standing

Before addressing the merits of Teeboom's appellate arguments, we consider the City's assertion that he lacks standing. For the purposes of our analysis, we assume without deciding that, as the City argues, the 2018 amendments to Part I, Article 8 of the State Constitution, related to taxpayer standing, do not apply to this case.

When the relevant facts are not in dispute, we review de novo the trial court's determination on standing. State v. Actavis Pharma, 170 N.H. 211, 214 (2017). "[S]tanding under the New Hampshire Constitution requires parties to have personal legal or equitable rights that are adverse to one another, with regard to an actual, not hypothetical, dispute, which is capable of judicial redress." Duncan v. State, 166 N.H. 630, 642-43 (2014) (citations omitted). "In evaluating whether a party has standing to sue, we focus on whether the party suffered a legal injury against which the law was designed to protect." Actavis Pharma, 170 N.H. at 215 (quotation omitted). "Neither an abstract interest in ensuring that the State Constitution is observed nor an injury indistinguishable from a generalized wrong allegedly suffered by the public at large is sufficient to constitute a personal, concrete interest." Id. (quotations omitted). "Rather, the party must show that its own rights have been or will be directly affected." Id. (quotation omitted).

In the trial court, Teeboom asserted that his personal rights were directly affected by passage of the 2018 budget because, by his calculations, his 2018 property taxes will be $290 more than they would have been had the wastewater treatment fund been included in the spending cap calculation. The City contends that Teeboom's assertion is insufficient to confer standing because his alleged injury "is shared generally by all other taxpayers in the city, meaning it is not a distinguishable, particularized injury." However, there is no requirement that a party suffer a "unique" injury to establish standing. Although, under our standing doctrine as articulated in Duncan and its progeny, a person's status as a taxpayer is not, by itself, sufficient to establish standing, taxpayer status in conjunction with an injury or impairment of rights can confer standing. See Duncan, 166 N.H. at 645 (to bring a declaratory

4

judgment action, a party must establish that some right of the party has been impaired or prejudiced by application of a rule or statute). As the United States Supreme Court has explained:

> As a general matter, the interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution does not give rise to the kind of redressable "personal injury" required for Article III standing. Of course, a taxpayer has standing to challenge the <u>collection</u> of a specific tax assessment as unconstitutional; being forced to pay such a tax causes a real and immediate economic injury to the individual taxpayer.

<u>Hein v. Freedom From Religion Foundation, Inc.</u>, 551 U.S. 587, 599 (2007).

Here, Teeboom contended that the adoption of the 2018 budget, based upon the elimination of the wastewater treatment fund from the spending cap calculation, would impair his personal rights by illegally increasing his property taxes. He asserted that his individual, annual tax bill would increase "proportional to the amount the spending cap had [impermissibly] exceeded the statutory limit." Thus, he did not merely assert standing as a taxpayer. <u>See</u> <u>Duncan</u>, 166 N.H. at 646 (holding that the petitioner's claim that a program would result in "net fiscal losses" to local governments does not articulate a personal injury sufficient to confer standing (quotation omitted)). Instead, Teeboom contested the collection of a specific tax, arguing that it results from a budget that is based upon an unlawful spending cap calculation. Although, arguably, other taxpayers in Nashua will suffer the same injury — increased property taxes — that does not mean that Teeboom's <u>personal</u> rights are not sufficiently impaired to confer standing.

The City also argues that Teeboom's assertion that his taxes will increase is too speculative, "conjectural and hypothetical" to confer standing. The City observes that, if the ordinance exempting the wastewater treatment fund from the spending cap had not passed, the board "could have adopted the exact same budget" by exempting "some or all of debt service or capital improvement expenditures from the spending cap calculations." The City further notes that the mayor and board "have other ways to respond to anticipated tax increases," such as by raising "the amount of unassigned general fund balance they annually choose to apply to the tax rate." "In short," the City argues, "one cannot say that this one specific action by the Mayor and Board of Aldermen directly resulted in an increase in any particular taxpayer's property tax, as there are other actions that were taken and could be taken by the Mayor and Board of Aldermen that affect the amount of property tax paid."

Contrary to the City's assertions, Teeboom's allegedly increased property taxes are not an abstract possibility. The 2018 budget was adopted, and, as

the City concedes, it was based upon calculations that excluded the wastewater treatment fund from the spending cap.

Nor is Teeboom's articulated injury insufficiently concrete because he cannot demonstrate that the elimination of the wastewater treatment fund from the combined annual municipal budget "directly resulted" in his having to pay increased property taxes. All that is required for standing purposes is that the alleged injury be "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quotation, ellipses, and brackets omitted); see Actavis, 170 N.H. at 216. We conclude that Teeboom has demonstrated the requisite causal connection between his injury — increased property taxes — and the claimed violation — the adoption of a budget based upon an impermissible spending cap calculation — sufficient to confer standing. See Conduent State & Local Solutions v. N.H. Dep't of Transp., 171 N.H. 414, 419 (2018).

To the extent that the City contends that Teeboom lacks standing because, as the trial court determined, the spending cap provision is unenforceable and, therefore, his claims are not "capable of judicial redress," we disagree. Duncan, 166 N.H. at 642-43. The City's argument and the trial court's standing decision misconstrue the redressability inquiry under Duncan. The redressability inquiry under our decision in Duncan and federal cases such as Lujan upon which Duncan relied, requires a court to presume that a favorable decision will issue. To establish standing, the plaintiff must show that it is "likely, as opposed to merely speculative, that [his] injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (quotations omitted; emphasis added). Here, the City's standing argument and the trial court's standing decision presume that an unfavorable decision will issue. That is not a "standing" inquiry, but rather is an inquiry into the merits of Teeboom's claims.

B.  Enforceability of the City's Spending Cap

Having concluded that Teeboom has standing, we now consider his appellate arguments on their merits. On appeal, Teeboom argues that the spending cap is enforceable either because it contains an override provision as required by RSA 49-C:12, III and :33, I(d), or because the City's spending cap is exempt from complying with RSA 49-C:12, III and :33, I(d) pursuant to RSA 49-B:13, II (2012).

Resolving these issues requires that we interpret the relevant statutes. We review the trial court's statutory interpretation de novo. See State v. Exxon Mobil Corp., 168 N.H. 211, 223 (2015). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Conduent State & Local Solutions, 171

6

N.H. at 419. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. at 419-20. Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole. Id. at 420. This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. Id.

Absent an ambiguity, we will not look beyond the language of the statute to discern legislative intent. Id. However, "[i]n the construction of a statute, it is proper to consider the previous state of the law, the circumstances which led to its enactment, and especially the evil or mischief which it was designed to correct or remedy." Appeal of Coastal Materials Corp., 130 N.H. 98, 103 (1987). In addition, "[w]hen interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes." Grand China v. United Nat'l Ins. Co., 156 N.H. 429, 431 (2007).

1. Overview of the Statutory Scheme

The statutory scheme at issue implements the so-called "home rule amendment," Part I, Article 39 of the State Constitution. City of Manchester v. Sec'y of State, 161 N.H. 127, 131 (2010). That amendment provides in part:

> The legislature may by general law authorize cities and towns to adopt or amend their charters or forms of government in any way which is not in conflict with general law, provided that such charters or amendments shall become effective only upon the approval of the voters of each such city or town on a referendum.

N.H. CONST. pt. I, art. 39.

The legislation implementing the home rule amendment is set forth in RSA chapters 49-B, 49-C, and 49-D. City of Manchester, 161 N.H. at 131. RSA chapter 49-B "provides the statutory framework through which cities and towns may amend their actual forms of government, and grants them the power necessary to carry out such changes." Id. (quotation omitted). The stated intent of RSA chapter 49-B is to allow municipalities to "adopt a form of government that best addresses local needs," while also recognizing the "need to require uniform procedures and practices when there is a corresponding state interest." RSA 49-B:1 (2012). Thus, RSA chapter 49-B "is intended only to provide a procedural framework by which a city or town may amend its actual form of government," and is not intended to "create any power in, or confer any power upon, any city or town beyond that necessary to carry out the amendment of a charter or form of government" as set forth in RSA chapter

7

49-B.  Id.  The legislature has instructed that RSA chapter 49-B is to be "strictly interpreted to allow towns and cities to adopt, amend, or revise a municipal charter relative to their form of government so long as the resulting charter is neither in conflict with nor inconsistent with the general laws or the constitution of this state."  Id.

In turn, "RSA chapters 49-C and 49-D work in conjunction with RSA chapter 49-B by providing a limited list of forms of government that are available to municipalities."  City of Manchester, 161 N.H. at 131 (quotation omitted).  A municipality "may establish either a town or city government," RSA 49-B:2, I (2012), and must prepare its charter according to the framework statutorily mandated for that municipal form.  City of Manchester, 161 N.H. at 132; see RSA ch. 49-C (2012) (city); RSA ch. 49-D (2012) (town).  We infer from the trial court's order that the City has a mayor-board of aldermen form of government as permitted by RSA chapter 49-C.  See City of Manchester, 161 N.H. at 132 (taking judicial notice that Manchester's charter denominates it as a city and that Manchester has chosen the mayor-board of alderman form of government).

RSA chapter 49-C "sets forth an exhaustive blueprint for the mayor-board of aldermen form of government."  Id. (quotation and brackets omitted).  Certain city charter provisions are statutorily-mandated.  See, e.g., RSA 49-C:23 (mandating that a city charter contain certain provisions related to the budget process and fiscal control).  Other city charter provisions are not mandated, but are statutorily-authorized.  See RSA 49-C:33, I (setting forth optional charter provisions).

Both RSA chapter 49-B and RSA chapter 49-C contain savings clauses.  Before 2011, the savings clause in RSA chapter 49-B provided, in pertinent part:

I.  The provisions of this chapter and of charters created under this chapter are separable.  If any portion of this chapter, or of any charter adopted under the provisions of this chapter, or if the application of the chapter or such charter to any person or circumstance shall be invalid, the remainder of the chapter or such charter or the application of such invalid portions to other persons or circumstances shall not be affected by such invalidation.

II.  All town and city charters which have been adopted, revised or amended; all charter commissions which have been properly established and elected; all elections properly held; and actions properly taken pursuant to such charters are hereby legalized, provided that such charters at the time of their adoption were not contrary to the general laws and constitution of the state.

8

RSA 49-B:13 (Supp. 2010) (amended 2011). The savings clause in RSA chapter 49-C provides:

> So much of the previous charter of the city and of laws passed in amendment or supplementary to the charter, as now may be in force, relative to the constitution and bounds of its several wards, its school districts and sewer, lighting, and other special precincts and their government and affairs, to its water works, and to the borrowing of money in aid of its school districts, is hereby continued in force, with the exception of such provisions as are inconsistent with this chapter. All special legislation relative to the government of the city, not expressly saved, is hereby repealed. All general laws relative to the government of cities shall remain in force in the city so far as consistent with this chapter. Existing ordinances and other municipal regulations shall remain in force so far as the same can be applied consistently with the intents and purposes of this chapter, but are hereby annulled so far as inconsistent with this chapter. In all existing laws, ordinances and regulations hereby saved, references to the city councils, board of mayor and aldermen, board of public works, or other bodies or officers hereby abolished and superseded, or to bodies or officers hereby abolished and superseded, or to bodies or officers whose constitution or functions are hereby altered, shall be taken to mean the body or officer upon whom jurisdiction of the matter in question is conferred by the charter or by the administrative code.

RSA 49-C:34.

Before 2011, there was no explicit statutory authorization for a municipality to include a spending cap in its charter. See City of Manchester, 161 N.H. at 132-34. Nor did the statutory scheme allow a city charter to contain a provision by which such a spending cap could be overridden by a two-thirds or supermajority vote. See id. at 133-34. Thus, in City of Manchester, we concluded that a proposed amendment to Manchester's charter that would have imposed a spending cap and would have allowed the cap to be overridden by a two-thirds vote of the board of aldermen violated RSA chapter 49-C. Id. at 128, 134. Specifically, we held that the proposed amendment violated RSA 49-C:12, I, because it constrained the board of aldermen "to either abide by the spending cap or act by a two-thirds majority to override it," thereby conflicting with the board's authority under RSA 49-C:12, I, "to adopt a budget by the vote of a simple majority." Id. at 134 (citation omitted).

In response, the legislature passed Senate Bill (SB) 2 in 2011. The stated purpose of SB 2 was to enable "the citizens of New Hampshire to adopt a tax

9

cap either in their charters or at their town meetings." Laws 2011, 234:1. Among other provisions, SB 2 amended RSA 49-C:12 to add a new paragraph, which provides: "Notwithstanding any contrary provision in paragraph I, the adoption of an override threshold provision to a tax cap included in a charter . . . shall provide for a supermajority vote of the elected body to adopt the annual budget." RSA 49-C:12, III; see Laws 2011, 234:2. SB 2 also added the following to RSA 49-C:33, I, which provides that "City charters may include provisions relating to any or all of the following matters":

> A limit on the annual spending increases that increase the amount raised by taxes under the city budget adopted pursuant to RSA 49-C:23. Such a tax cap shall provide for an override threshold on a vote to exceed the limit on annual increases which shall be by a supermajority as determined in the charter. A tax cap provision in the city charter may provide for specific exclusions for dedicated, enterprise, or self-supporting funds or accounts, capital reserve funds, grants, or revenue from sources other than local taxes.

RSA 49-C:33, I(d); see Laws 2011, 234:3. In addition, SB 2 amended RSA 49-B:13 to add:

> All town or city charters which have been adopted, revised, or amended to include a tax or spending cap of any kind and all charter commissions which have been properly established and elected; all elections properly held; and all actions properly taken related to the tax or spending cap in such charters are hereby endorsed, ratified, validated, and legalized and are fully enforceable, without regard to whether such entities or actions were authorized by law at the time they were established or taken.

RSA 49-B:13, II-a; see Laws 2011, 234:7.

The instant appeal asks that we decide whether: (1) the City's spending cap contains an override provision as required by RSA 49-C:12, III and :33, I(d); and (2) if not, whether the spending cap, nevertheless, is enforceable under RSA 49-C:13, II-a.

### 2. Whether the City's Spending Cap Contains an Override Provision

We agree with the trial court that the City's spending cap does not contain an override provision within the meaning of RSA 49-C:12, III and :33, I(d). RSA 49-C:12, III and :33, I(d) require a city charter to contain a provision by which a supermajority of the pertinent body may "exceed" the spending cap

("the limit on annual increases"). RSA 49-C:33, I(d); see RSA 49-C:12, III. The City's spending cap does not include such a provision.

Rather, the spending cap allows the board to exempt from the spending cap municipal bond and capital expenditures. Under the plain meaning of RSA 49-C:33, I(d), a provision related to exempting expenditures from a spending cap does not constitute an override provision. The sentence regarding the required override provision is followed immediately by a sentence allowing a spending cap to "provide for specific exclusions for dedicated, enterprise, or self-supporting funds or accounts, capital reserve funds, grants, or revenue from sources other than local taxes." RSA 49-C:33, I(d). This language indicates that the legislature distinguishes between override provisions and provisions allowing certain expenditures to be excluded from the spending cap. Consistent with the interpretative canon that the "legislature is not presumed to waste words or enact redundant provisions and whenever possible, every word of a statute should be given effect," we conclude that a vote to exempt expenditures from a spending cap does not constitute a vote to exceed the spending cap for the purposes of RSA 49-C:12, III and :33, I(d). In re Search Warrant (Med. Records of C.T.), 160 N.H. 214, 221 (2010) (quotation omitted). Accordingly, we hold that the provision of the City's charter that allows the board to exempt municipal bond and capital expenditures from the spending cap does not constitute an override provision within the meaning of RSA 49-C:12, III and :33, I(d).

In arguing for a contrary result, Teeboom observes that, at trial, the City's current mayor, who was also mayor in the 1980s, referred to the provision allowing the board to exempt certain expenditures from the spending cap as an "override" provision. The mayor's subjective belief that the City's spending cap contains an override provision is irrelevant to our statutory interpretation.

### 3. Whether the City's Spending Cap is Enforceable

Having concluded that the City's spending cap does not contain an override provision within the meaning of RSA 49-C:12, III and :33, I(d), we next consider whether the spending cap is, nonetheless, enforceable pursuant to RSA 49-B:13, II-a. Teeboom argues that the override requirement pertains only to spending caps adopted after SB 2 was enacted. He contends that, pursuant to RSA 49-B:13, II-a, any spending cap that was adopted before SB 2 is "endorsed, ratified, validated, and legalized and [is] fully enforceable" in both the past and future, without condition, regardless of whether it contains an override provision. RSA 49-B:13, II-a.

The City counters that, although RSA 49-B:13, II-a "begins expansively[,] . . . all that comes before is modified by the last clause," which provides: "without regard to whether such entities or actions were authorized by law at

11

the time they were established or taken," RSA 49-B:13, II-a.  The City contends that any spending cap adopted before SB 2 was enacted is "saved from a challenge asserting that [it was] not authorized by law at the time [it was] enacted," but is not "saved from challenges asserting that [it is] not authorized by current law."  The City contends that, to rule that the City's spending cap need not comply with RSA 49-C:12, III and :33, I(d), requires adding words to RSA 49-B:13, II-a that the legislature did not include and violates the principle that the expression of one thing in a statute implies the exclusion of another (expressio unius est exclusio alterius).  The City also argues that such an interpretation is contrary to the purpose of RSA chapter 49-B, and, by extension, RSA chapters 49-C and 49-D, which is to "require uniform procedures and practices when there is a corresponding state interest."  RSA 49-B:1.

"[W]henever possible, a statute will not be construed so as to lead to absurd consequences."  Petition of Poulicakos, 160 N.H. 438, 444 (2010) (quotation and ellipsis omitted).  "Thus, as between a reasonable and unreasonable meaning of the language used, the reasonable meaning is to be adopted."  Id. (quotation omitted).  Here, we conclude that the City's interpretation of the statute is the only reasonable interpretation because, unlike Teeboom's interpretation, the City's interpretation gives meaning to all parts of the statute, is consistent with our canons of statutory construction, and gives effect to the legislature's expressed intent.

The City's interpretation of RSA 49-B:13, II is consistent with the plain meaning of the statutory language.  Pursuant to its plain language, the statute endorses, ratifies, validates, legalizes and renders "fully enforceable" any spending cap adopted before 2011, without regard to whether it was lawful to adopt a spending cap at that time.  The phrase "are hereby endorsed, ratified, validated, and legalized and are fully enforceable" must be read together with the next clause, "without regard to whether such entities or actions were authorized by law at the time they were established or taken."  Accordingly, as the City argues, the final clause of RSA 49-B:13, II-a — "without regard to whether such entities or actions were authorized by law at the time they were established or taken" — modifies what comes before it  —"All town or city charters which have been adopted, revised, or amended to include a tax or spending cap of any kind . . . are hereby endorsed, ratified, validated, and legalized and are fully enforceable."  Pursuant to the plain meaning of RSA 49-B:13, II-a, previously-enacted spending caps are "endorsed, ratified, validated, and legalized and are fully enforceable" only with respect to whether they were lawful when adopted.  Thus, as the City contends, such caps are safe only from challenges based upon the grounds set forth in City of Manchester, 161 N.H. at 132-34; RSA 49-B:13, II-a does not render them safe from challenges based upon other grounds.

12

In context, therefore, under RSA 49-B:13, II-a, a "tax or spending cap of any kind" that was adopted before 2011 and "all actions properly taken" related to that tax or spending cap are capable of being enforced notwithstanding the fact that, before 2011, there was no statutory authorization for a municipality to adopt such a cap. In other words, the fact that there was no statutory authorization for a municipality to adopt a tax or spending cap before 2011 is not a barrier to enforcing a previously-adopted cap.

Such an interpretation is consistent with "ordinary rules of grammar" pursuant to which a modifying phrase should be placed next to the clause it modifies. Anderson v. Robitaille, 172 N.H. ___, ___ (decided March 8, 2019) (slip op. at 5); see In re Richard M., 127 N.H. 12, 17 (1985) (explaining that "[a]lthough the legislature is not compelled to follow technical rules of grammar and composition, a widely accepted method of statutory construction is to read and examine the text of the statute and draw inferences concerning its meaning from its composition and structure" (quotation omitted)); see also Mt. Valley Mall Assocs. v. Municipality of Conway, 144 N.H. 642, 652 (2000) (explaining the "last antecedent rule" of statutory construction).

Likewise, the City's interpretation is consistent with the legislature's expressed intent, which is "to require uniform procedures and practices when there is a corresponding state interest." RSA 49-B:1. Here, the legislature demonstrated a state interest in ensuring that municipal spending caps contain override provisions by referring to that requirement in two statutes, RSA 49-C:12, III and RSA 49-C:33, I(d). See RSA 49-C:12, III ("the adoption of an override threshold provision to a tax cap included in a charter pursuant to RSA 49-C:33, I(d) shall provide for a supermajority vote of the elected body to adopt the annual budget"), :33, I(d) ("Such a tax cap shall provide for an override threshold on a vote to exceed the limit on annual increases which shall be by a supermajority as determined in the charter."). The word "shall" denotes that the override provision and the supermajority vote are mandatory requirements. See Appeal of Rowan, 142 N.H. 67, 71 (1997). The legislature's decision to allow municipalities to adopt tax or spending caps only if they contain override provisions is a policy decision that we cannot second guess.

By contrast, Teeboom's construction is inconsistent with the statute's plain meaning and our established canons of statutory interpretation. His interpretation requires that we read the first clause in isolation, and it renders the final clause superfluous. Under his interpretation, the language "without regard to whether such entities or actions were authorized by law at the time they were established or taken" could be deleted from the statute, and the meaning of the statute would remain unchanged. However, we do not consider words and phrases in isolation, Conduent State & Local Solutions, 171 N.H. at 420, and "every word of a statute should be given effect," In re Search Warrant (Med. Records of C.T.), 160 N.H. at 221 (quotation omitted).

13

Teeboom's construction also contravenes the legislature's expressed intent of requiring uniform practices when there is a corresponding state interest.  See RSA 49-B:1.  As well, it conflicts with RSA 49-C:33, I(d), which authorizes a municipality to adopt a spending cap, but provides that such caps "shall" include "an override threshold."  RSA 49-C:33, I(d).  The override provision is a mandatory requirement, and the statute contains no exceptions for spending caps adopted before its effective date.  Teeboom's construction of RSA 49-B:13, II-a directly conflicts with this mandatory requirement.  Indeed, his construction requires adding language to RSA 49-B:13, II-a that the legislature did not see fit to include.  He construes it to mean:

> All town or city charters which have been . . . amended to include a tax or spending cap of any kind and . . . all actions properly taken related to the tax or spending cap in such charters are hereby endorsed, ratified, validated, and legalized and are fully enforceable, without regard to whether such entities or actions were authorized by law at the time they were established or taken or whether they comply with the requirements of RSA 49-C:12, III and RSA 49-C:33, I(d).

Furthermore, the City's construction directly and narrowly addresses the "evil or mischief" that SB 2 "was designed to correct or remedy."  Appeal of Coastal Materials Corp., 130 N.H. at 103.  The problem faced by the legislature in 2011 was how to respond to City of Manchester.  After we decided City of Manchester, caps adopted before 2011 were potentially vulnerable to legal challenge on the same grounds as was the spending cap in City of Manchester.  In addition, past actions taken pursuant to those caps were potentially vulnerable to legal challenge as a result of the City of Manchester decision.  Thus, the "evil or mischief" the legislature was attempting to correct was the lack of authority we recognized in City of Manchester, and the effects that might flow from that lack of authority in municipalities that had adopted spending or tax caps similar to Manchester's.

It is that exact "mischief" that is remedied by the City's construction of the statute — by ratifying past actions properly taken related to spending caps and making them fully effective "without regard to whether [they] were authorized by law at the time they were established or taken," the legislature "undid" the effects of City of Manchester and protected municipalities from challenges to their past actions based on the grounds set forth in City of Manchester.  The evident intent of the legislature was to immunize existing spending caps from challenges based upon the lack of authority we identified in City of Manchester, not, as Teeboom posits, to immunize those caps from all challenges for all time.  See RSA 49-B:13, II-a (ratifying all actions "properly taken" related to a previously-enacted spending cap).

14

Although we need not examine legislative history, Teeboom invites us to do so. Our review of that history confirms that the legislature intended SB 2 to provide the statutory authorization that we held was lacking in City of Manchester. See Laws 2011, 234:1 (explaining that purpose of SB 2 is to enable "the citizens of New Hampshire to adopt a tax cap either in their charters or at their town meetings").

Senator Boutin, one of SB 2's sponsors, explained that SB 2 was "derived from the Supreme Court's ruling in the case of Manchester." Relative to Adoption of Spending Caps by Municipalities, SB 2, 2011 Session (N.H. 2011) (Apr. 19, 2011 hearing, remarks of Senator Boutin); see also N.H.S. Jour. 43 (2011) (identifying Senator Boutin as one of the sponsors of SB 2); N.H.S. Jour. 435 (2011) (Senator Boutin explaining that "Senate Bill 2 is enabling legislation that permits localities to adopt a spending cap"). Similarly, the majority committee report of the House Municipal and County Government Committee explained:

> The purpose and intent of SB 2 is to provide a process by which any municipality may adopt a tax/spending cap. The bill amends RSA [chapter] 49-C and RSA [chapter] 49-D so that cities or towns that are governed by a town or city council can amend their charters to include spending caps. The legislation also provides a clear process by which a charter can be amended and it provides the language necessary to comply with [a] recent supreme court ruling.

N.H.H.R. Jour. 1087 (2011) (emphasis added).

Nothing in the legislative history of SB 2 suggests that the legislature specifically intended to exempt spending caps adopted before 2011 from the override provision requirement. Indeed, it appears that the legislature viewed override provisions as mechanisms that allow municipalities the flexibility necessary to address local needs. See N.H.S. Jour. 435, 436 (2011) (Senator Boutin explaining that SB 2 is intended as a "measure to get local budgetary expenditures under control" and that "in order to override the spending cap, it requires a two-thirds or a three-fifths supermajority vote" (quotation omitted)).

According to Senator Boutin's public hearing testimony, "[t]he purpose of the override is to address special circumstances" and to ensure that municipal officials "are not handicapped by the existence of caps" in meeting local needs. Relative to Adoption of Spending Caps by Municipalities, SB 2, 2011 Session (N.H. 2011) (Apr. 19, 2011 hearing, remarks of Senator Boutin). The override provision was intended to grant municipalities "flexibility." Id. As another legislator testified, "[T]he over-ride is important to take care of genuine emergencies." Relative to Adoption of Spending Caps by Municipalities, SB 2,

Teeboom's interpretation of RSA 49-B:13, II-a suggests that the legislature intended not to provide the citizens of certain municipalities with the protection it afforded all others. When the legislature took its first look at tax and spending caps, it made the policy decision that any such cap must provide for an override process. See RSA 49-C:12, III, :33, I(d). Teeboom's interpretation of the statute implies that the legislature concluded that this protection should be afforded only to citizens of municipalities that had not already adopted a cap. We can discern no possible reason why the legislature would have intended not to provide the citizens of Nashua, for example, with the same protections it gave everyone else. Indeed, such a result would be contrary to the legislature's stated intent of requiring uniform practices when there is a corresponding state interest. See RSA 49-B:1.

For all of the above reasons, therefore, we affirm the trial court's determination that the City's spending cap is unenforceable because it does not contain an override provision.

Affirmed.

BASSETT and DONOVAN, JJ., concurred; HICKS and HANTZ MARCONI, JJ., concurred in part and dissented in part.

HICKS and HANTZ MARCONI, JJ., concurring in part and dissenting in part. We concur in parts II.A., II.B.1. and II.B.2. of the majority's decision. We write separately because we disagree with part II.B.3. of that decision. We agree with plaintiff Teeboom that, pursuant to the plain language of RSA 49-B:13, II-a (2012), the spending cap of defendant City of Nashua (City) is enforceable regardless of whether it contains an override provision. On its face, RSA 49-B:13, II-a pertains to "[a]ll town or city charters which have been adopted, revised or amended to include a tax or spending cap of any kind." RSA 49-B:13, II-a. Under RSA 49-B:13, II-a, all such charters that include a spending cap "of any kind" are "hereby endorsed, ratified, validated, and legalized and are fully enforceable." Id. (emphases added). Pursuant to its plain meaning, therefore, RSA 49-B:13, II-a renders the City's spending cap "fully enforceable" regardless of whether it contains an override provision.

We disagree with the City and the majority that the last clause of RSA 49-B:13, II-a narrows the phrase "hereby endorsed, ratified, validated, and legalized and are fully enforceable." The plain meaning of the last clause, "without regard to whether such entities or actions were authorized by law at the time they were established or taken," is that a charter, which was amended or adopted before Senate Bill 2 was enacted to include a spending cap "of any kind," is "fully enforceable," even though, when the charter was amended or

16

adopted, state law did not expressly allow a city or town to adopt a spending cap. See City of Manchester v. Sec'y of State, 161 N.H. 127, 132-34 (2010).

To our view, the majority and the City misconstrue the plain meaning of the phrase "are fully enforceable." Under the majority's and the City's interpretation, previously-adopted spending caps are only "fully enforceable" if they contain an override provision. Such an interpretation requires that we add language to RSA 49-B:13, II-a, which the legislature did not see fit to include. RSA 49-B:13, II-a renders "fully enforceable" previously-adopted spending caps "of any kind," not just those containing override provisions.

Moreover, to the majority and the City, previously-adopted spending caps are not, in fact, "fully" or entirely enforceable. Rather, in the City's words, "[t]hey are saved from a challenge asserting that they were not authorized by law at the time they were enacted," but are not "saved from challenges asserting that they are not authorized by current law." However, the use of the present tense indicates that previously-adopted spending caps are capable of being enforced under the current statutory scheme.

We acknowledge that, at first blush, it appears that enforcing the City's spending cap, which does not contain an override provision, contravenes the legislature's intent "to require uniform procedures and practices when there is a corresponding state interest," assuming, of course, that the State has an interest in ensuring that a spending cap contains an override provision. RSA 49-B:1 (2012). However, the purpose of RSA chapter 49-B, and correspondingly, RSA chapters 49-C and 49-D, is to balance the need for uniform procedures and practices with a municipality's interest in "adopt[ing] a form of government that best addresses local needs." Id. Whether allowing previously-adopted spending caps not to contain override provisions while requiring newly-adopted spending caps to contain such provisions strikes the right balance is a policy decision for the legislature, not for this court. See Petition of Kilton, 156 N.H. 632, 645 (2007).

For all of the above reasons, therefore, we would reverse the trial court's determination that the City's spending cap is unenforceable because it does not contain an override provision and remand for further proceedings.

17